511 So.2d 875 (1987)
Mrs. Donnis SLAY, Individually, and as Administratrix of the Estate of Micheal Stuart Bell, Deceased
v.
ILLINOIS CENTRAL GULF RAILROAD CO. and S.I. Price.
No. 56521.
Supreme Court of Mississippi.
April 22, 1987.
Rehearing Denied September 16, 1987.
*876 Jim Kitchens, Constance Johnson, Kitchens & Pickard, Hazlehurst, for appellant.
Richard E. Stratton, III, Daniel H. Fairly, Stratton & Fairly, Brookhaven, for appellees.
Before HAWKINS, P.J., and PRATHER and GRIFFIN, JJ.
GRIFFIN, Justice, for the Court:
This case, involving a railroad crossing accident, comes to the Court from the Circuit Court of Lincoln County, where a jury returned a verdict for the defendants, Illinois Central Gulf Railroad Co., the train's operator, and S.I. Price, its engineer. Though sympathetic to the plaintiff, Mrs. Donnis Slay, for her son's death, we affirm.
On February 28, 1984, at 9:00 A.M., while sleeting and snowing, eighteen-year-old Micheal Stuart Bell, driving his parents' 1979 Pontiac stationwagon at approximately fifteen miles per hour, was struck by a southbound Illinois Central Gulf freight train, travelling at approximately twenty miles per hour. The train carried the automobile 1628 feet before stopping, instantly killing its sole occupant.
The Damascus Crossing, where the accident occurred, consists of three tracks: the northbound main line, a storage track, and the southbound main line. A crossbuck and stop bar, marked on the pavement, warned of the crossing.
Ninety-six feet north of such was a string of railroad cars, the first of which was a flat car of fifty-seven feet, situated on the storage track, parallel to and between the main lines, which obstructed the view of motorists approaching the southbound main line from the east, like Bell. Indeed, the record indicates that although the train began to ring its bell and blow its horn as far as 1100 feet from the crossing, Bell apparently failed to notice it until astride the southbound main line. Likewise, the engineer and brakeman failed to see Bell's automobile until they passed the last boxcar, parked on the center track, 153 feet north of the crossing; Bell was then thirty-seven feet east of the southbound main line, or seven feet beyond the stop bar. Though the engineer immediately applied the emergency brakes, it was impossible to slow the train, weighing 16,933 tons, short of the crossing.

I.
At trial, Slay called E.L. Martin, the train's brakeman, and requested that he be cross-examined as an adverse witness. The court denied the request. On appeal, Slay contends that Martin was sufficiently identified with the appellees as to constitute an adverse witness: (1) he was an employee of the Illinois Central Gulf, and (2) the amended complaint listed his negligence as a contributing cause of the accident. Slay then alleges error, based on M.R.C.P. 43(b)(3), which reads,
Leading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony. Ordinarily, leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions. (emphasis added)
Though now abrogated, Rule 43(b)(3) is identical to Miss.R.Ev. 611(c).
In Harris v. Buxton T.V., Inc., 460 So.2d 828, 833 (Miss. 1984), this Court, construing *877 Rule 43(b)(3), promulgated a "test" to determine the presence of witnesses identified with an adverse party:
If the witness' acts or omissions are the predicate for a party's claim or defense, that is, if in a case such as this under the plaintiff's theory of the case the defendant is subject to potential liability in substantial part not just because of his own actions but because of the actions or omissions of the witness in question, then that witness is ordinarily sufficiently identified with an adverse party and may be called as an adverse witness and interrogated by leading questions. (emphasis added)
See also, Mills v. Nichols, 467 So.2d 924, 927 (Miss. 1985). Under this test, Martin was in fact a witness identified with an adverse party, thereby subject to leading questions from Slay; consequently, the judge erred when he failed to designate Martin as an adverse witness. Yet, this does not require a reversal.
Apparently, the judge thought better of his ruling because Slay elicited extensive testimony from Martin, by cross-examination. For example, when Martin's testimony concerning the location of Bell's automobile contradicted his previous deposition, the trial judge allowed Slay's counsel to cross-examine, showing prior inconsistent statements. Indeed, the record is replete with instances of cross-examination, and there is nothing to suggest that Slay suffered any prejudice as a result of the judge's initial ruling. Miss.Sup.Ct. Rule 11.
In Maryland Casualty Co. v. City of Jackson, 493 So.2d 955 (Miss. 1986), the Court faced a similar set of facts. There, the trial judge improperly refused to allow counsel to lead an adverse witness on direct examination, though later permitted such, when the witness' testimony varied from responses to pre-trial interrogatories. We concluded, "Where ... counsel goes ahead and manages either without objection or with permission of the trial court to conduct modest cross-examination, it is difficult to say that the trial judge's original error was such that it affected a substantial right of the party." Maryland Casualty Co., 493 So.2d at 958. Here, Slay examined Martin in detail, and where his testimony differed from the deposition, counsel used leading questions to elicit responses. The trial judge's original error then was cured, protecting Slay's right to examine her witness, fully.

II.
In response to interrogatories, Slay stated that she intended to call James T. McNamara as an expert witness, testifying as to the speed and stopping distance of a train similar to that in question. Slay called McNamara to show that the train exceeded the posted speed limit of twenty miles per hour, since it required 1781 feet to stop, indicative of a higher speed.
McNamara testified extensively concerning the braking systems of trains, at times giving a page or more in narrative form of his opinion relating to the trains' brakes. On cross-examination, the appellees quite naturally asked many questions of McNamara, including an inquiry concerning the application of the train's service brakes, preceeding the use of its emergency brakes, and if such reduced the emergency brakes' efficiency when attempting to avoid the accident. McNamara answered that such would not reduce the emergency brakes' ability to stop the train. This factual scenario was in evidence by appellant's witnesses.
The appellees then called R.L. Copeland, who also testified as to the function of the train's emergency brakes, disputing McNamara's conclusion. Slay alleges error, arguing that the trial judge improperly admitted Copeland's testimony, over objection, when the appellees' answers to interrogatories failed to disclose that Copeland would testify as to the train's braking system, a violation of M.R.C.P. 26(b)(4), which reads, in part:
Discovery of facts known and opinions held by experts, otherwise discoverable under subsection (b)(1) of this rule and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:

*878 (A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. (emphasis added).
See, Mayor and Aldermen of City of Vicksburg v. Vicksburg Printing & Publishing Co., 434 So.2d 1333, 1339 (Miss. 1983).
Specifically, McNamara testified on direct examination that a train, similar to that in question, required 933 feet in which to stop, if first travelling at twenty miles per hour. On cross-examination, defense counsel then asked McNamara:
If there had been a service application of the brakes of about ten pound reduction, and that you so carefully explained, that's PSI, pounds per square inch, right?
A. Yes.
Q. Would that have affected the stopping distance if it were placed in emergency after the service application were made on a ten pound reduction?
A. No, sir.
Q. It would not affect it at all?
A. No, sir. Two separate reservoirs in the car involved. The emergency reservoir and the equalizing reservoir. The equalizing handles the service reduction, and the emergency handles the emergency reduction.
Q. Now, let's get to the issue of  you say that the application of the emergency brake did not reduce the RPM or the amps, is that what you're saying?
A. That's right, sir.
Q. And you base that figure, do you not, on the fact that in the Southern Pacific and other lines there are different type engines built from this 8300 series, that when they drop the load they do go to zero amps?
A. They all do, sir.
Q. You're saying that every train, including this 8300  it's your opinion, based on your expertise, that that's the way this type engine should function?
A. Right, sir.
In response, defense counsel called Copeland, whom answers to interrogatories had identified as the Mechanical Superintendent for Illinois Central Gulf, an expert on the locomotive in question. In particular, the answers stated that Copeland would testify concerning the locomotive's amperage load, during an application of the emergency brakes. On direct examination, defense counsel asked Copeland:
What effect, if any, would a service application of the train  a normal slowing or braking of the train  and its release immediately prior to an emergency application  what effect would that service application and release have on the emergency application?
A. Well, it would have  it would affect, because it would change the ratio of brake cylinder pressure on the train.
Q. If it were a ten pound reduction or application and release, what effect would that have on the reaction of the emergency application?
A. On the first application of the emergency portion, it wouldn't change the ratio at all. The critical factor there is that on the second stage of emergency, because you change the train line pressures with the first application, it would change the ratio of brake cylinder pressure for the second stage. It could change it as much as ten pounds.
Q. And what effect, if any, would that have on stopping ability of the train?
A. It would increase the distance.
Copeland's testimony then disputed McNamara's findings.
Moreover, there is no error in the situation outlined above. Indeed, defense counsel's inquiry, concerning the use of service brakes immediately prior to the emergency stop, was a natural subject for cross-examination. When McNamara testified that there was no adverse effect, defense counsel properly posed the same question to his own witness previously identified as an expert on locomotives.
*879 Significantly, this does not disturb our holdings in two recent decisions concerning related problems. In Harris v. General Host Corp., 503 So.2d 795, 797 (Miss. 1987), we found a procedural right to the disclosure of an expert's name, where interrogatories had requested such information prior to trial. Likewise, in Jones v. Hatchett, 504 So.2d 198, 202 (Miss. 1987), we reversed an award of damages where counsel provided the expert's name, but failed to offer any information regarding his anticipated testimony. See also, Winston v. Cannon, 430 So.2d 413, 415 (Miss. 1983), Square D. Co. v. Edwards, 419 So.2d 1327, 1329 (Miss. 1982).
Yet, in this instance, defense counsel provided both Copeland's name and the areas of his anticipated testimony. When offered then as an expert "in the field of mechanical operation of locomotive engines and trains," his remarks on the operation of the emergency brakes were not error.

III.
Next, Slay contends that Copeland's testimony, refuting McNamara's opinion that the train's lead locomotive was defective, consisted of inadmissible hearsay. Specifically, employees of the Illinois Central Gulf, present for McNamara's tests, told Copeland, incorrectly, that McNamara had engaged the locomotive's independent brake, prior to his examination. None of these employees subsequently testified at the trial. Slay then objected, arguing that the employee's remarks to Copeland, which he related at trial, were hearsay. Yet, the trial judge overruled the objection, finding Copeland's testimony admissible, since it was "not for the purpose of proving the truth of what was told him, but for the purpose of showing that it was told to him, which led him to take certain other actions," namely, to conduct his own test of the locomotive. We agree.
Simply put, hearsay is "an out-of-court statement, not made under oath and not subjected to cross-examination, which is introduced for the truth of the matter asserted." Ellis & Williams, Miss. Evidence, § 8-1 (1983). Here, the trial judge properly ruled that Copeland's testimony, relating statements made by those present at McNamara's test, was introduced not to show the manner of McNamara's examination, but to explain the basis for his own test of the locomotive. Consequently, there was no error.

IV.
The request for a peremptory instruction asks the trial court to hold, as a matter of law, that the evidence is insufficient to support a verdict for the non-moving party. Therefore, the trial court must consider all of the evidence in a light most favorable to the non-moving party, and if the evidence is so overwhelmingly in favor of the movant that reasonable men and women could not have arrived at a contrary verdict, the motion is granted. Yet, if there is evidence such that reasonable men and women might reach different conclusions, the motion is denied, and on appeal, the jury's verdict stands. Weems v. American Security Insurance Co., 450 So.2d 431, 435 (Miss. 1984); Paymaster Oil Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975); General Tire & Rubber Co. v. Darnell, 221 So.2d 104, 105 (Miss. 1969).
Here, Slay contends that Illinois Central Gulf was negligent, as a matter of law, when it failed to provide an adequate warning to motorists at the Damascus Crossing, where parked railroad cars obstructed the view of the southbound main line. In particular, Slay mentions the proximity of the parked cars to the crossing (ninety-six feet); the remaining track north of the parked cars, not utilized (104 feet); the minimal cost for the railroad to move the parked cars further north; the inability of the train's crew to see the crossing, fully, until 153 feet north of it; the inadequacy of a crossbuck and stop bar at such a crossing located forty-three feet from the southbound main line; the engineer and brakeman's knowledge of the parked cars' presence at the crossing; their knowledge of the type of warnings at the crossing; their failure to employ an oscillating headlight, contrary to the railroad's own regulation; and their knowledge that the train was *880 unable to slow from twenty miles per hour in the distance between the string of railroad cars and the crossing.
Previously, we have held that a railroad must exercise a degree of care commensurate with the situation at an unusually dangerous crossing, requiring the train to adjust its speed accordingly. New Orleans & Northeastern Railroad Co. v. Phillips, 252 Miss. 438, 450, 172 So.2d 414, 419 (1965). See also, New Orleans & Northeastern Railroad Co. v. Anderson, 293 F.2d 97, 98 (5th Cir.1961).
Additionally, we have found that questions involving the engineer's alleged improper lookout, New Orleans & Northeastern Railroad Co. v. Shows, 240 Miss. 604, 608-09, 128 So.2d 381, 382 (1961); New Orleans & Northeastern Railroad Co. v. Lewis, 214 Miss. 163, 175, 58 So.2d 486, 491 (1952), failure to maintain the train at a safe speed, New Orleans & Northeastern Railroad Co. v. Burney, 248 Miss. 290, 310-311, 159 So.2d 85, 95 (1963); Yazoo & Mississippi Valley Railroad Co. v. Aultman, 179 Miss. 109, 119, 173 So. 280, 281 (1937); and failure to take proper precautions at an unusually dangerous crossing, Illinois Central Railroad Co. v. Williams, 242 Miss. 586, 595, 135 So.2d 831, 834 (1961), were for the jury or trier of fact. The jury, in fact, received instructions on these elements.
Moreover, there is no indication that the railroad or the engineer acted in violation of any state statutes involving the train's operation, Miss. Code Ann. § 77-9-225 (1972) (Locomotives to give warning when approaching crossings), or the crossing's maintenance, Miss. Code Ann. § 77-9-247 (Supp. 1986) (Railroads should erect "railroad crossbuck").
Likewise, Bell was under a statutory duty when he approached the crossing. Miss. Code Ann. § 77-9-249 (Supp. 1986), reads in part:
(1) Whenever any person driving a vehicle approaches a railroad grade crossing under any of the circumstances stated in this section, the driver of such vehicle shall stop within fifty feet but not less than fifteen feet from the nearest rail of such railroad, and shall not proceed until he can do so safely. The foregoing requirements shall apply when:
... .
(c) A railroad train approaching within approximately nine hundred feet of the highway crossing emits a signal in accordance with section 77-9-225, and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard;
... .
(3) In the trial of all actions to recover personal injury or property damages, sustained by any driver of such vehicles for collision of said vehicle and train in which action it may appear that the said driver may have violated any of the provisions hereof, the question of whether or not the said violation was the sole or approximate cause of the accident and injury shall be for the jury to determine. The violation of this section shall not of itself defeat recovery, and the question of negligence or the violation aforesaid shall be left to the jury; and the comparative negligence statutes and prima facie statute of this state shall apply in these cases as in other cases of negligence. (emphasis added).
Although there was no testimony at trial concerning Bell's compliance with or breach of the duties imposed on him by this statute, the statute makes clear that questions regarding such are, again, for the jury's determination.
At the time of the accident, there was evidence to show that the train was ringing its bell and blowing its horn proceeding within the confines of the reduced, posted speed limit. The jury, instructed as to the duty owed by the appellees at an unusually dangerous crossing, returned a verdict for the railroad and the train's engineer. There is nothing to suggest from the appellees' conduct that they were negligent as a matter of law. Additionally, the "Court cannot say as a matter of law that the crossing ... was unusually dangerous or that it proximately caused or contributed to the collision." Sills v. Illinois Central *881 Gulf Railroad Co., 246 Miss. 497, 504, 150 So.2d 521, 523 (1963). Rather, these were issues for the jury.

V.
Finally, Slay argues for a new trial, alleging that the jury's verdict was against the overwhelming weight of the evidence. For this contention, Slay relies on evidence concerning speed and distance.
On a number of occasions, this Court has held that conflicts in evidence are to be resolved by the jury. Accordingly, testimony "must be so strongly preponderate that the court can safely say it was overwhelmingly in favor of the appellant," before this Court will interfere with a jury's verdict. Jackson v. Griffin, 390 So.2d 287, 289 (Miss. 1980). See also, Powers v. Malley, 302 So.2d 262, 265 (Miss. 1974); Louisville & Nashville Railroad Co. v. Gutierrez, 208 So.2d 908, 909 (Miss. 1968); Green v. Pendergraft, 253 Miss. 891, 901, 179 So.2d 831, 836 (1965).
In this case, there was evidence to support the jury's verdict. For example, Martin testified that Bell's automobile suddenly stopped astride the southbound main line, when Bell apparently "put on his brakes." Bell then turned and "was just looking straight at the engine," seemingly struck with fear. The train was then still far enough from the crossing for Bell to have cleared the track prior to the lead locomotive's arrival. This testimony, apparently accepted by the jury, absolves the railroad and its engineer of liability.
This is a sad case and the Court is sympathetic with the plaintiff, and we believe this was the attitude of the trial judge. However, it was his duty to instruct the jury, and the jury was thoroughly instructed on the findings of fact necessary to impose liability upon the defendants. Significantly the giving and refusal of instructions are not assigned as error here. The plaintiff received a fair and impartial trial and was well represented by competent counsel who prepared the case in a manner that this Court deems very commendable. The jury, under its oath, had the duty to decide the facts, and this record and the conduct of the trial supports the jury's verdict.
Consistent with the above, we affirm.
AFFIRMED.
WALKER, C.J., ROY NOBLE LEE and HAWKINS, P.JJ., and DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.