606 So.2d 1069 (1992)
Albert SAWYER and New Hampshire Insurance Company
v.
ILLINOIS CENTRAL GULF RAILROAD COMPANY and the Madison County Board of Supervisors.
No. 89-CA-1171.
Supreme Court of Mississippi.
August 5, 1992.
Rehearing Denied August 26, 1992.
*1070 Paul Snow, Paul Snow & Associates, James F. Mixson, Shell Buford Bufkin Callicutt & Perry, Jackson, for appellant.
Charles T. Ozier, Andrew D. Sweat, Wise Carter Firm, Rebecca B. Cowan, Montgomery Smith-Vaniz & McGraw, Jackson, C.R. Montgomery, Montgomery Smith-Vaniz & McGraw, Canton, for appellees.
Before ROY NOBLE LEE, C.J., and ROBERTSON and SULLIVAN, JJ.
ROBERTSON, Justice, for the Court:

I.
This appeal arises from a railroad crossing accident and presents principally problems of permissible evidence, one concerning a federal statute shielding the product of a crossing safety enhancement program. We find that the Circuit Court fairly followed the tracks laid down, at the end of which the jury found for the railroad.
We affirm.

II.

A.
Our scene is near the rural Ragin Community not too far from the Kearney Industrial Park out from Flora in Northwest Madison County. A railroad track owned by the Illinois Central Railroad Company (ICG) runs generally north and south and intersects with an east-west county road alternatively known as the Grady Luke Road, the Vernon Anderson Road and the Moore Avenue Road. Our focus is upon the crossing's northwest quadrant whose angle is slightly less than the full ninety degrees. All agree the speed limit on the road is 35 miles an hour.[1]
On July 31, 1986, in broad open daylight, Albert Sawyer was driving a delivery truck on Grady Luke Road heading in an easterly direction and approaching the crossing. Evidence suggests that he may have been driving as fast as 55 or 60 miles per hour. We know Sawyer left skid marks measuring from 167 feet to 201 feet before the point of impact. Some 322 feet west of the crossing, Sawyer met a standard railroad crossing sign  a circular sign with a large black X and an R on the right and left sections, all against a yellow background. The slightly elevated railroad crossing is clearly visible ahead from this point. Sawyer then sped over reflectorized railroad markings on the pavement approaching the crossing. An "X" cross-buck sign on a creosote pole stood in its customary spot on the right hand sign of the road just before *1071 the track.[2]
As Sawyer approached from the west, a three engine, ninety-nine car, ICG-operated train approached from the north. The train was proceeding at approximately 35 miles per hour. The engineer sounded the air horn and bell some 900-1000 feet north of the crossing and continued so until the train occupied the crossing.
The engineer saw Sawyer's approaching vehicle a few seconds before the collision and made a full and complete emergency brake application, which concededly at this point could not stop the train short of the crossing. When Sawyer finally saw the train, he slammed on his brakes and his vehicle skidded across the center to the northernmost edge of the roadway when he struck the second engine roughly one-third aft its nose.
We are treated to a considerable debate how far back Sawyer should have reasonably seen the train and vice versa and what obstructions there were to view, all to the end of fussing over whether this was an unreasonably dangerous crossing. The photographs in evidence reflect, despite the lesser angle, a greater view in the northwest quadrant  the view for vehicles approaching from the west looking for trains coming from the north  than appears for the other quadrants of the crossing. It is clear the foliage was of little consequence. Weeds and brush range from three to six feet tall, while ICG's three locomotives were each nineteen feet high. We do note two buildings in the northwest quadrant, a larger one which appears to be a store farthest to the west and smaller tin roofed building which confounds a westbound motorist's view until he is some 165 feet from the crossing, after which point the motorist has a clear and unobstructed view of a southbound train. Other photographs make clear a motorist passing the store should be able to look to his left and see an approaching train before it passes behind the nearest building, that is, that an approaching train can be seen easily at 276 feet from the crossing.

B.
Procedurally, this action began on August 21, 1986, when ICG filed its complaint in the Circuit Court of Hinds County for the First Judicial District, naming Sawyer and his employer as defendants and seeking recovery of damages done ICG's train. Rather clearly, Sawyer was within the course and scope of his employment when the accident occurred. Sawyer answered and made no objection to the Hinds County venue, a point of note below.
On December 11, 1987, arising from the same crossing accident, Sawyer filed a personal injury damage suit in the Circuit Court of Madison County, Mississippi, naming as defendants, inter alia, ICG and the Madison County Board of Supervisors. No process was issued, however, and the Madison County matter lay dormant for some time.
On June 15, 1988, Sawyer returned to the Hinds County action and filed a counterclaim against ICG, stating the same personal injury claim he had previously pleaded (but not pressed) in Madison County. See Rule 13(a), Miss.R.Civ.P. ICG then settled its property damage claim against Sawyer and his employer, and an order of dismissal to that effect was entered on January 6, 1989. This left the Hinds County action alive in the form of Sawyer's counterclaim against ICG, a claim which became his principal claim.
On February 1, 1989, Sawyer moved in the Hinds County Court to have the case transferred to Madison County. Two days later, he finally had process issued and served upon ICG in his Madison County action. On March 23, 1989, the Circuit Court of Hinds County held venue settled *1072 in its county and denied transfer. On May 11, 1989, the Circuit Court of Madison County entered its order transferring the Madison County proceedings to be joined with the earlier-filed Hinds County action.
On September 11, 1989, the matter came to trial on Sawyer's personal injury claim against ICG in the Circuit Court of Hinds County, Mississippi. In due course, the jury returned a verdict for ICG. Sawyer then timely moved for judgment notwithstanding the verdict or, in the alternative, for a new trial. The Circuit Court denied this motion on October 17, 1989.
Sawyer now appeals to this Court. ICG cross-appeals, arguing the Circuit Court erred in denying its motion for a directed verdict. Rule 50(a), Miss.R.Civ.P.

III.
Sawyer first questions venue. He argues the Circuit Court of Hinds County erred when it denied his motion that this case be transferred to Madison County for trial.[3] The action commenced with ICG filing its complaint in the Circuit Court of Hinds County naming Sawyer and his employer as defendants. Sawyer was "found" in Hinds County, and process was served on him there at a location believed to be his residence. Sawyer now says he has been a resident of Yazoo County at all times since the accident.
What is important is that Sawyer answered and counterclaimed without making complaint regarding the Hinds County venue. Our law is settled that objections to venue are waived if not timely asserted. Rule 12(h)(1), Miss.R.Civ.P., provides a defendant waives any objection to venue if not made by motion or answer filed with the time allowed in Rule 12(a), thirty days or any extension thereof. Here Sawyer was the original defendant. He answered on September 18, 1986, but did not question the Hinds County venue. Two and a half years later  on February 1, 1989, he first moved to transfer venue. This was much too late. Atwood v. Hicks, 538 So.2d 404, 407 (Miss. 1989); H & W Transfer and Cartage Service, Inc. v. Griffin, 511 So.2d 895, 901 (Miss. 1987); Belk v. State Department of Public Welfare, 473 So.2d 447, 448-50 (Miss. 1985); see also, Abbott, Venue of Transitory Actions Against Resident Individual Citizens in Mississippi, 58 M.L.J. 1, 19-22 (1988).
Waiver or no, venue is quite proper in Hinds County. Miss. Code Ann. § 11-11-5 (Supp. 1989) provides venue for suits against railroads
in the county where the cause of action accrued, in the county where the defendant has its principal place of business or in the county where the plaintiff resides.
By the time this point was raised at trial, the parties had been realigned and ICG was the defendant. The record reflects without contradiction that ICG has its principal place of business in the First Judicial District of Hinds County, Mississippi. The fact that venue may also have been proper in other counties is beside the point. Nothing before us suggests prejudice or any other prevailing matter by reference to which it might be argued the Circuit Court abused its discretion in denying Sawyer's motion for a change of venue. See Maxwell v. Illinois Central Gulf Railroad, 513 So.2d 901, 909 (Miss. 1987).

IV.
Sawyer argues the Circuit Court erred when it refused to allow him to place before the jury certain documents and exhibits and testimony from officials of the Mississippi State Highway Department regarding safety problems at the crossing. He points to four particulars:
(1) a letter of September 11, 1984, (2 years before this accident) from the Mississippi State Highway Department recommending that flashing lights be installed at this crossing; (2) the hazard rank inventory; (3) the testimony of Arnett Livingston concerning notice of the unusually dangerous condition two years before this accident to ICG; (4) the testimony *1073 of L.T. Livingston concerning the crossing's hazard which was in the top 1% most dangerous in Mississippi.
Context is all important. A number of years ago, the federal government developed a program for enhancing the safety of railroad crossings across the country. The states were encouraged to participate under federal guidelines and upon compliance would receive ninety percent federal funding for such upgrade projects. Federal law and regulations directed the states to survey their circumstances and prepare data on crossings where safety improvements may be needed. To the end that candor might obtain regarding hazards that exist, the Congress acted to protect information developed in connection with the program from use in any civil litigation arising out of railroad crossing accidents. Specifically, the Congress has enacted:
Notwithstanding any other provision of law, reports, surveys, schedules, lists, or data compiled for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 152 of this title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing highway funds shall not not be admitted into evidence in Federal or State Courts or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists or data.
23 U.S.C.A. § 409 (Supp. 1992).
Pursuant to this program, highway officials of this state prepared a hazard rank inventory, and it appears that in September of 1984, published a hazard rank inventory measured by frequency of accidents, reflecting that the crossing in question is the twenty-third most dangerous crossing in Mississippi. This ranks in the top one percent. Via a September 11, 1984, letter, Highway Department State Aid Supervisor E.A. Livingston advised a number of parties, including ICG, of this and that the state recommended an active, flashing light warning device at this crossing.
Sawyer concedes "that the hazard rank inventory and the letter of September 11, 1984, were generated in the process of developing a highway safety construction improvement project using federal aid highway funds." (Brief of Appellant, filed May 25, 1990, p. 30) He nevertheless argues that the letter and inventory should have been admitted to approve notice to ICG of the dangerousness of the crossing. Failing that, and while conceding that the letter of September 11, 1984, and the hazard rank inventory fall within the litany of types of protected documents, Sawyer argues the statute says nothing about testimony. He urges a literalistic reading of the statute, to exclude the actual documents, but allow witnesses to testify to their contents. This argument is specious. Sawyer cites no authority supporting it, and we suggest this is because there is none.
More seriously, Sawyer launches an all-out assault on the enforceability of Section 409 as a rule of evidence in the courts of this state. Section 409 articulates a rule of evidence, and Sawyer says this Court makes the law of evidence for this state and that no legislature has authority to interfere, citing Newell v. State, 308 So.2d 71, 78 (Miss. 1975), and progeny. Emboldened, Sawyer resorts to the Tenth Amendment to the Constitution of the United States and argues the federal government has no authority to tell us what rules of evidence to enforce in the courts of this state. Sawyer cites to us considerable off-the-mark constitutional principles, but neglects the United States Constitution's Article VI, Section 2, the Supremacy Clause, which provides:
This constitution, and the laws of the United States which shall be made in pursuance thereof; ... . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding.
Section 409 is one of the laws of the United States by which all judges of this state and the courts they serve are bound, notwithstanding *1074 anything in the constitution and laws of this state, having to do with rule-making power, inherent authority, Newell v. State, or anything else.
Besides, nobody made Mississippi get into the railroad crossing safety enhancement program. It is a voluntary program. Duly authorized officials of this state, however, have committed us to the program  in exchange for ninety percent federal funding  and it does not strike us outrageous that we should accede to the federal government's rules and regulations appertaining thereto. We have it on good authority that Missouri and Louisiana have rejected challenges to Section 409. See Claspill v. Missouri Pacific Railroad Co., 793 S.W.2d 139 (Mo. 1990); Martinolich v. Southern Pacific Transportation Co., 532 So.2d 435 (La. Ct. App. 1988). We accept Section 409 as controlling, as well.
The United States District Court for the Northern District of Alabama has spoken to the meaning of Section 409. Bearden v. Southern Railway Co., No. CV88-PT-0005-S (N.D.Ala. July 11, 1988) (unpublished opinion). That Court said the plain language of the statute
precludes data related to railroad-highway crossings from being admitted or considered for other purposes.... The apparent purpose of this provision is to foster the free flow of safety-related information between the railroad industry and its regulatory bodies by precluding the possibility that such information would be discoverable and admissible in civil suits.
The Martinolich case from Louisiana elaborated upon the sort of materials and evidence proscribed by Section 409:
This enumeration suggests something more than simple factual information that [the state transportation department] has gathered. These documents may reflect mental impressions, conclusions, and opinions of [state transportation department] representatives regarding a survey of railroad grade crossings in need of "separation, relocation, or protective devices ...," if compiled in compliance with 23 U.S.C. § 130; or mental impressions, conclusions, and opinions of [state transportation department] representatives regarding "hazardous locations, sections, and elements ... [to be assigned] priorities for the correction of such ... and [for the implementation of] a schedule of projects for their "improvement," if complied in compliance with 23 U.S.C. § 152.
Martinolich, 532 So.2d at 439. See also, Robertson v. Union Pacific Railroad Co., 954 F.2d 1433, 1435 (8th Cir.1992); Taylor v. St. Louis Southwestern Ry Co., 746 F. Supp. 50, 53-55 (D.Kan. 1990); Claspill v. Missouri Pacific Railroad Co., 793 S.W.2d 139, 141 (Mo. 1990); Duncan v. Union Pacific Railroad, 790 P.2d 595 (Utah Ct.App. 1990).
Without further ado, we hold the Circuit Court correctly refused to allow Sawyer to place before the jury any of the four items of evidence here in dispute.

V.
Some six months after the accident  in January of 1987, it appears  flashing light warning devices were installed at the Grady Luke Road crossing. State Highway Department officials, in cooperation with Madison County authorities, made this safety enhancement and did so with ninety percent federal money under the program discussed in Section IV above. ICG was but a passive participant in this public improvement.
Sawyer was well aware of this from the outset, and, well prior to trial, ICG moved to preclude his exploring the point before the jury. The Circuit Court granted the motion and ordered excluded
any evidence or inference that flashing lights were installed at the subject crossing after the date of the accident, ...
Our general rule of evidence precludes production at trial of subsequent remedial measures. Rule 407, Miss.R.Ev.[4] Sawyer *1075 argues the rule does not control for the reason that ICG did not install the flashing light safety device and, what's more, one of its witnesses testified on deposition:
From my personal knowledge, I do not believe that this accident had anything to do with the installation of flashing lights.
Of course, Sawyer's point proves too much, for the only theory on which anyone has ever seriously argued subsequent remedial measures ought be admitted is that they reflect after-the-fact some "guilty knowledge" on the part of the defendant that a dangerous condition had theretofore existed.
The present record is uncontradicted that the flashing light warning devices were installed (in part) as a subsequent remedial measure, albeit this was done by public authorities, and the plans had been set in motion long before Albert Sawyer had his July 31, 1986, encounter with ICG's train. We decided the question in Mitcham v. Illinois Central Gulf Railroad Co., 515 So.2d 852 (Miss. 1987). In Mitcham we were content to repeat simply the settled law that pretermits use of evidence of subsequent remedial measures to establish negligence. Rule 407; Mitcham, 515 So.2d at 857, citing Catholic Diocese of Natchez-Jackson v. Jaquith, 224 So.2d 216, 224 (Miss. 1969), and Chicago Mill & Lumber Co. v. Carter, 209 Miss. 71, 77, 45 So.2d 854, 856 (1950).

VI.
Sawyer was able to get before the jury the fact of some six motor vehicle-train accidents at this crossing in the eight years preceding July 1, 1986. ICG emphasized the fact that none of these involved eastbound motor vehicles and southbound trains. The tenor of the evidence is that the crossing is considerably more dangerous for motorists approaching from the east and traveling in a westerly direction, who face more substantial obstructions to their view of a possible approaching train. In this context, Sawyer sought to prove that the northwest quadrant was dangerous, too  that the danger existed as well for eastbound motorists encountering trains approaching from the north. To do this, he sought to offer evidence of two "near misses," the barely missed motorists being Reverend Jim Dixon and Walter McField.
We have no doubt there are cases where evidence of near accidents may be admissible for the purpose of showing the dangerous character of a place and to show notice thereof to the person in control. Rules 401, 402, Miss.R.Ev.; S.H. Cress & Co. v. Markline, 117 Miss. 37, 77 So. 858, 862 (1918); Missouri-Kansas-Texas Railroad Co. v. McFerrin, 279 S.W.2d 410 (Tex.Civ. App. 1955). On the other hand, the fact of a near miss, and, for that matter, a hit, in and of itself proves very little and indeed may be quite prejudicial. See Rule 403, Miss.R.Ev. The fact that an accident almost occurs at a particular location does not necessarily imply any fault or neglect on the part of the person in control of the premises. The point has an important context. Railroad crossings are dangerous places, and they are no less so that we encounter the danger with less frequency than in other days. Wilner v. Mississippi Export Railroad Co., 546 So.2d at 681. Accepting these realities, our statute law mandates a motorist "look and listen as he approaches a crossing." Mitcham v. Illinois Central Gulf Railroad Co., 515 So.2d at 855; Slay v. Illinois Central Gulf Railroad Co., 511 So.2d at 880; Dale v. Bridges, 507 So.2d 375, 377 (Miss. 1987). When trains approach sounding their signals, roadway travelers must give heed. Miss. Code Ann. § 77-9-249 (1972). Accordingly, to be admissible, prior-accident  and certainly near-miss-testimony  must be carefully qualified. Mitcham, 515 So.2d at 855-56; Parmes v. Illinois Central *1076 Gulf Railroad, 440 So.2d 261, 265 (Miss. 1983).
Sawyer's proffer failed to preclude motorist fault in the near misses. He also failed to show notice to ICG of the incidents. We think the Circuit Court was well within its discretionary authority when it held the proffered testimony from the witnesses Dixon and McField were not sufficiently qualified. The Court committed no error here requiring reversal.

VII.
Sawyer presents several further issues. We have considered these with care and find that none merits discussion, see Rule 35(b), Miss.S.Ct. Rules, or reversal.
By virtue of our disposition of Sawyer's direct appeal, the issues raised by ICG on cross-appeal are moot.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, SULLIVAN and PITTMAN, JJ., concur.
DAN M. LEE, P.J., concurs as to part VI and dissents as to parts III, IV, and V, without written opinion.
McRAE, J., dissents without written opinion.
BANKS, J., not participating.
NOTES
[1] At trial there were more than a few disputes regarding the facts and as well inferences that may be drawn from the facts. By reason of the jury's verdict, we summarize the facts reasonably consistently with the verdict.
[2] There can be no serious suggestion that these passive warning signs fell below minimum standards mandated by law. Miss. Code Ann. § 77-9-247 (1972); Wilner v. Mississippi Export Railroad Co., 546 So.2d 678, 681-82 (Miss. 1989); Mitcham v. Illinois Central Gulf Railroad Co., 515 So.2d 852, 854 (Miss. 1987); Slay v. Illinois Central Gulf Railroad Co., 511 So.2d 875, 880 (Miss. 1987).
[3] Sawyer does not appeal the May 11, 1989, order of the Circuit Court of Madison County which transferred Sawyer's suit there filed to Hinds County. See Rule 28(a)(3), Miss.Sup.Ct. Rules.
[4] Rule 407 in its entirety reads as follows:

When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.