# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1999-DP-01369-SCT

*CURTIS GIOVANNI FLOWERS*

*v.*

*STATE OF MISSISSIPPI*

### ON MOTION TO MODIFY OPINION

| | |
|---|---|
| DATE OF JUDGMENT: | 03/31/1999 |
| TRIAL JUDGE: | HON. C. E. MORGAN, III |
| COURT FROM WHICH APPEALED: | MONTGOMERY COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | F. KEITH BALL |
| | JAMES W. CRAIG |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: |
| | MARVIN L. WHITE, JR. |
| | JUDY T. MARTIN |
| DISTRICT ATTORNEY: | DOUG EVANS |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | REVERSED AND REMANDED - 04/03/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.    This Court's prior opinion is withdrawn, and this opinion is substituted therefor.

¶2.    On March 21, 1997, Curtis Giovanni Flowers was indicted in Montgomery County for the capital murder of Derrick "BoBo" Stewart. Flowers was also separately indicted for the capital murder of three other victims, Bertha Tardy, Carmen Rigby and Robert Golden. The State originally filed a motion to consolidate the four cases without opposition from Flowers but, it later withdrew the motion. Flowers then

moved to have the four trials consolidated, but the trial court denied his motion. After a change of venue to the Circuit Court of Lee County, Flowers was convicted and sentenced to death for the murder of Bertha Tardy on October 17, 1997. On appeal, this Court reversed and remanded the case for a new trial. *Flowers v. State*, 773 So. 2d 309 (Miss. 2000) ("*Flowers I*"). Admittedly, in the case sub judice, the State did not have the benefit of our decision in *Flowers I* before the trial concerning the death of Derrick Stewart was commenced.

¶3.     The case sub judice was set for trial on September 14, 1998. However, during voir dire it became apparent that a fair and impartial jury could not be impaneled. As a result, the trial court granted Flowers's renewed motion for change of venue and changed the venue to the Circuit Court of the First Judicial District of Harrison County. The trial proceeded before the jury on March 22, 1999. On March 30, 1999, the jury returned a verdict of guilty. A sentencing hearing was held, and, on March 31, 1999, the jury imposed the death penalty. After Flowers's motions for a judgment notwithstanding the verdict, or in the alternative, a new trial were denied, Flowers timely filed a notice of appeal before this Court. The execution of the death sentence was stayed pending appeal.

## FACTS

¶4.     On July 16, 1996, Sam Jones, Jr., received a telephone call from Bertha Tardy, the owner of Tardy Furniture Company (Tardy's) in Winona, asking him to come to the store to instruct two new employees on loading and unloading furniture. Jones testified he arrived at the store "somewhere close to around" 9:30 a.m. Upon his arrival, Jones discovered the body of Derrick Stewart and three other Tardy employees. Jones ran to a nearby business and asked an employee to call the police and an ambulance. Winona Chief of Police Johnny Hargrove responded to the call, and upon his arrival, he immediately called for backup

2

and an ambulance. Chief Hargrove also contacted the District Attorney's Office, the Mississippi Highway Safety Patrol and the Mississippi Crime Lab.

¶5.    Stewart was found to still be breathing, so he was transported to the local hospital; however, he subsequently died on July 23, 1996.

¶6.    During the investigation it was determined that the gunshot wound which eventually killed Stewart was consistent with a .380 caliber weapon. Doyle Simpson, Flowers's uncle, reported a .380 pistol stolen from his car on the day of the murders. A witness placed Flowers at Simpson's car early on the morning of the murder. Flowers was questioned on the afternoon of the murders and consented to a gunshot residue test, but he was not detained at that time. Flowers moved to Texas at the end of September, but after further investigation had been completed, he was arrested and brought back to Mississippi. The State elected to indict Flowers separately on four charges of capital murder. The circuit court judge denied Flowers's motion to consolidate the four separate causes.

¶7.    At trial the State called nineteen witnesses to testify during its case in chief. Melissa Schoene was the State's first witness. Schoene, a certified crime scene analyst with the Mississippi Crime Lab, recovered a bullet projectile, a bullet projectile fragment and two bullet casings for a .380 caliber automatic pistol in the area where Stewart's body was found. Further ballistics tests proved that the .380 caliber automatic pistol used to kill Stewart belonged to Doyle Simpson.

¶8.    Doyle Simpson, Flowers's uncle, testified his gun was stolen the morning of July 16 from his car at the Angelica Factory where he was employed at the time. He testified he went to work at 6:15 a.m., and the pistol was in his glove compartment; however, when he got in his car to pick up lunch at approximately 11:00 a.m., the pistol was gone. Katherine Snow, an employee at Angelica, testified that

3

she saw Flowers "laying on the front end of Doyle Simpson's car" between 7:15 and 7:30 a.m. the morning of July 16.

¶9. Chief Hargrove identified photographs showing bloody footprints that were obtained from the crime scene. Barry Eskridge, owner of MedStat Ambulance Service, found a shoe track next to Stewart's body. Because Sam Jones stated he did not remember seeing the track when he entered the store initially, Chief Hargrove and Eskridge checked the footwear of all personnel at the scene. Both men testified that no footwear at the scene was consistent with the shoe track. The footprints at the scene were later determined to be consistent with Fila Grant Hill size 10½ tennis shoes, the same size as worn by Flowers. A Grant Hill Fila shoe box, size 10½, was recovered from the home of Flowers's girlfriend, Connie Moore.

¶10. Since Flowers had previously been employed at Tardy's, he was interviewed on the afternoon of July 16 by Jack Matthews, a Mississippi Highway Patrol investigator. Matthews testified that Flowers stated he was staying with his girlfriend, Connie Moore, and babysitting her children that morning. Flowers told investigators the only places he had been that morning were his sister's house on Dennis Street and a convenience store, Kelly's Stop and Go, on Highway 51. Flowers consented to a gunshot residue test. The test came back positive for "one single particle" of gunshot residue.

¶11. During questioning, Flowers told the investigators that he started working at Tardy's on June 29, but he did not return to work after July 3. He stated that on July 3, 1996, some batteries, which he had picked up for Mrs. Tardy, fell off the back of the truck he was driving and were damaged. Flowers told investigators that although Mrs. Tardy held him responsible for the batteries, he and Mrs. Tardy did not have any problems and there was no argument between them regarding the batteries. Flowers also stated Mrs. Tardy loaned him thirty dollars on July 3 but would not give him the rest of his paycheck because it was used to pay for the damaged batteries.

¶12.    Roxanne Ballard, Bertha Tardy's daughter, testified to the normal operating procedures of the store. She identified a "daily check-up sheet" and testified that based on the document, there was $400 in the cash drawer on July 16. Jack Matthews later testified that when he observed the cash drawer on July 16, it contained no bills. Later $255 was discovered in the home of Connie Moore, Flowers's girlfriend. Flowers was living with Moore at the time of the murder.

¶13.    The State was able to place Flowers at the scene of the crime by the testimony of several witnesses. Charles Collins testified that he saw two men across the street from the store around 10:00 a.m. Collins stated that one of these men was Flowers. Another witness, Clemmie Fleming, also testified that she saw Flowers running from the store on the morning of July 16. Fleming testified that Roy Harris drove her to Tardy's on the morning of July 16 to pay her furniture bill, but she did not go in to pay it because she was not feeling well. Patricia Hollman, who also saw Flowers the morning of the murders, testified that when she saw Flowers, he was wearing Fila tennis shoes.

¶14.    After the State's case-in-chief, the defense moved for a directed verdict, and the trial judge overruled the motion. During the defendant's case-in-chief, Roy Harris testified that he had seen a man running in downtown Winona at about 9:00 a.m. on the morning of July 16, but Clemmie Fleming was not with him at the time. Harris testified that almost an hour later, Fleming asked him to take her to Tardy's, but before they reached the store, she changed her mind and asked him to take her to her mother's house instead.

¶15.    To further refute Fleming's testimony placing Flowers at Tardy's on the morning of the murders, the defense presented the testimony of three witnesses who testified that Fleming had not seen Flowers running from Tardy Furniture. Latarsha Blisset and Stacey Wright, Fleming's cousins, both testified that Fleming admitted to them that she had not seen Flowers running from the store. Fleming's sister, Mary Ella

5

Fleming, testified that when Clemmie Fleming arrived at her house on the morning of the murders, a friend came to tell them Mrs. Tardy had been killed. Mary Ella Fleming further testified that she and her sister went down to Tardy's, but that Clemmie Fleming never mentioned anything about having seen Flowers earlier that morning.

¶16.    After the defense rested, the State submitted rebuttal testimony. At this point the State rested, and the case went to the jury.

¶17.    On March 30, 1999, the jury returned a verdict of guilty. A sentencing hearing was held, and, on March 31, 1999, the jury returned the verdict of death finding, just as the jury had in *Flowers I*, two aggravators:

> 1) The capital offense was committed for pecuniary gain during the course of an armed robbery, and
>
> 2) The Defendant knowingly created a great risk of death to many persons.

On April 9, 1999, Flowers filed his motion for a JNOV or, in the alternative, for a new trial. A hearing was held on the motions, and on June 21, 1999, the trial court denied the post-trial motions. On August 18, 1999, Flowers timely filed a notice of appeal before this Court and raises the following issues:

I.      **WHETHER FLOWERS WAS DENIED HIS FUNDAMENTAL AND CONSTITUTIONAL RIGHT TO A FAIR TRIAL BY THE ADMISSION OF EVIDENCE AND ARGUMENT OF OTHER CRIMES AND WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY FAILING TO CONDUCT THE REQUISITE RULE 403 BALANCING TEST.**

II.     **WHETHER FLOWERS WAS DENIED HIS FUNDAMENTAL AND CONSTITUTIONAL RIGHT TO A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT.**

III.    **WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR DURING THE SENTENCING HEARING BY FAILING TO ANSWER THE JURY'S QUESTION.**

6

IV.     WHETHER FLOWERS WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 3, SECTIONS 14 AND 26 OF THE MISSISSIPPI CONSTITUTION.

V.      WHETHER FLOWERS WAS DENIED HIS FUNDAMENTAL AND CONSTITUTIONAL RIGHT TO A FAIR TRIAL BY THE TRIAL COURT'S PREJUDICIAL COMMENT BEFORE THE JURY.

VI.     WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY OVERRULING FLOWERS'S OBJECTIONS TO THE OPINION AND HEARSAY TESTIMONY OF JOE ANDREWS.

VII.    WHETHER THE EVIDENCE WAS INSUFFICIENT TO SUPPORT FLOWERS'S CONVICTION OF CAPITAL MURDER AND THE VERDICT OF DEATH.

VIII.   WHETHER FLOWERS WAS DENIED HIS FUNDAMENTAL AND CONSTITUTIONAL RIGHT TO A FAIR SENTENCING HEARING BY THE SUBMISSION OF THE "GREAT RISK OF DEATH TO MANY PERSONS" AGGRAVATING CIRCUMSTANCE.

IX.     WHETHER THE TRIAL COURT VIOLATED FLOWERS'S RIGHTS SECURED BY THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND MISSISSIPPI LAW BY THE SUBMISSION OF AN ANTI-SYMPATHY SENTENCING INSTRUCTION.

X.      WHETHER FLOWERS WAS DENIED HIS FUNDAMENTAL AND CONSTITUTIONAL RIGHT TO A FAIR TRIAL BY THE CUMULATIVE EFFECT OF THE MATTERS ADDRESSED ABOVE.

¶18.    Upon meticulous review of the record and consideration of the applicable law, this Court is absolutely compelled to find that, as in *Flowers I*, the State employed a tactic or trial strategy of trying Flowers for all four murders during this trial for which he was indicted only for the murder of Derrick Stewart. Evidence of the other victims was admitted through photographs, diagrams and other testimony, which was neither relevant nor necessary to prove the State's case-in-chief against Flowers for the murder

7

of Stewart. By using this tactic or trial strategy, the State improperly prejudiced the jury and denied Flowers his fundamental right to a fair trial. We therefore hold Flowers did not receive a fair trial, and we reverse and remand for a new trial.

¶19.    As we also held in *Flowers I*, we further find that the prosecutor repeatedly argued facts not in evidence.  This occurred during the cross-examination of several witnesses and during the closing arguments of both the district attorney and the assistant district attorney. The testimony of expert witness, Joe Andrews, was also improperly admitted by the circuit court, as it was hearsay.  For these additional reasons, we must also reverse and remand for a new trial.  Finally, as we likewise found in *Flowers I*, there was an accumulation of errors which warrant reversal. Inasmuch as this Court is reversing this case for the reasons thus far stated, there is no need to discuss the other assignments of error as so asserted by Flowers.

## DISCUSSION

¶20.    The standard for this Court's  review of an appeal from a capital murder conviction and death sentence is abundantly clear. On appeal to this Court, convictions upon indictments for capital murder and sentences of death must be subjected to "heightened scrutiny." *Balfour v. State*, 598 So. 2d 731, 739 (Miss. 1992) (citing *Smith v. State*, 499 So.2d 750, 756 (Miss. 1986); *West v. State*, 485 So.2d 681, 685 (Miss. 1985)).  Under this method of review, all doubts are to be resolved in favor of the accused because "what may be harmless error in a case with less at stake becomes reversible error when the penalty is death." *Id.* (quoting *Irving v. State*, 361 So.2d 1360, 1363 (Miss. 1978)). *See also Fisher v. State*, 481 So.2d 203, 211 (Miss. 1985).

**I. WHETHER FLOWERS WAS DENIED HIS FUNDAMENTAL AND CONSTITUTIONAL RIGHT TO A FAIR TRIAL BY THE ADMISSION OF EVIDENCE AND ARGUMENT OF OTHER CRIMES AND WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY FAILING TO CONDUCT THE REQUISITE RULE 403 BALANCING TEST.**

¶21.    According to Flowers, the State presented evidence and testimony throughout the trial in clear violation of the Mississippi Rules of Evidence. (See specifically Miss. R. Evid. 401-404(b)). Flowers, who was indicted on four separate counts of murder, argues that the State left the issues relevant to the Stewart indictment with "reckless abandon" and presented an overwhelming amount of evidence and testimony regarding the other three victims. Flowers claims, as was the case in ***Flowers I***, that he was denied his fundamental right to a fair trial due to the prosecution's tactics and trial strategy. The State argues the case sub judice is clearly distinguishable from ***Flowers I*** and all evidence admitted was necessary to the prosecution of its case. The State claims a higher burden of proof was placed on it because this case was purely circumstantial.

¶22.    "In criminal procedures, due process requires, among other things, that a criminal prosecution be conducted according to established criminal procedures." ***Mackbee v. State***, 575 So. 2d 16, 24 (Miss. 1990). "To establish those procedures this Court has promulgated the Mississippi Rules of Evidence to guide the admission of relevant evidence." ***Id. See*** Miss. R. Evid. 401, 402.

¶23.    Our Mississippi Rules of Evidence were judicially enacted and adopted by this Court by order dated September 24, 1985, which order stated, inter alia, that these rules "govern[ed] all proceedings in any action had on or after January 1, 1986," in the courts of this State. While these rules are obviously patterned after the Federal Rules of Evidence, they are also a codification of long-standing and well-established Mississippi case law relating to admissibility of evidence. By now, these rules and our

9

interpretation of these rules are hardly a mystery to the lawyers practicing in our state courts. At the time that Flowers went on trial in Gulfport, in March of 1999, these rules were in their fourteenth year of life.

¶24. As noted above, while these rules "guide the admission of relevant evidence," even relevant evidence may not be admissible "if its probative value is substantially outweighed by the danger of unfair prejudice." Miss. R. Evid. 403. One area in which relevant evidence may be excluded is in the admission of evidence of other crimes, wrongs or acts. Miss. R. Evid. 404(b). However, an exception to the inadmissibility of evidence of other crimes may occur when the purpose of admission is for the purpose of establishing "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Miss. R. Evid. 404(b).

¶25. "Even when other-crimes evidence is admissible under M.R.E. 404(b), it must pass through the 'ultimate filter' of M.R.E. 403." *Smith v. State*, 656 So. 2d 95, 99 (Miss. 1995) (citing *Jenkins v. State*, 507 So.2d 89, 93 (Miss. 1987)). "Furthermore, the jury must be informed as to the limited purpose for which they are allowed to consider the other-crimes evidence. This cannot be accomplished if 'its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *Id.* (quoting *Jenkins*, 507 So. 2d at 93).

¶26. Flowers recognizes the exceptions to the rules of evidence, but he argues the State "engaged in tactical overkill" by their total disregard for whether the evidence introduced was relevant, or even necessary, to prove the elements of the Stewart indictment.

¶27. Although Flowers was indicted separately for each of the four murders, there were repeated occurrences of the introduction of evidence of the other three victims. The State began with an opening statement which could have been presented (though not properly) at any of the trials involving the Tardy

10

Furniture murders.  The District Attorney began his argument by stating four individuals were working at

Tardy Furniture the day of the murders. He then went into detail about each employee:

> BY MR. EVANS:   Now Tardy Furniture Store that has been operated up there for many years; Tom Tardy was the owner of the store originally. And Tom Tardy was still living but was not really able to run the store at this time.  His wife, Bertha Tardy, was the actual one that ran the store.   Along with her, Carmen Rigby was the bookkeeper that worked at the store.  Now at the particular time that this crime occurred there were two other employees in the store.  Derrick "BoBo" Smith– Stewart, I'm sorry, is the case that we are here on today.  He was a young male.  He was a high school student. He was a baseball star there in the community, and this was a summer job for him.  This wasn't even a full time job.  We will show you that this was his second day to even work for Tardy Furniture.
>
> A lot of the things that you see in here are going to be real coincidental like that.  If it had been a day  or two earlier, he wouldn't have even been at the store.  Robert Golden was the other person in the store.  It was even more coincidental for him because he had just been hired that day.  This was his first day at work.  He had been hired by Sam Jones, who had been an employee of the store for forty or fifty years.  He showed up that morning for the first time, and it was the last time he would be there.

Sam Jones was later allowed to testify that he found four bodies at Tardy's and the condition of each of

those bodies.

> Q.   Did it appear to you that Mr. Golden was alive or dead at the time that you saw him?
> A.   He was, he appeared to be dead.  Yes.
> Q.   Okay.  And you testified a few moments ago that you saw Bertha Tardy.  Where did you see her in the store?
> A.   Well, after I looked at Mr. Golden, I turned around again and looked at BoBo. And just as I raised up to go get help for him because I figured the rest of them was dead-- I hadn't seen Ms. Tardy.  But I raised up to go get help for him, and when I raised up, well, I just, I was turning  around, and I glanced out in the aisle, and I saw her laying up in the aisle there.
> Q.   Ms. Tardy, Bertha Tardy?

11

A.     Yes.

Q.     When did you first notice-- did you know Carmen Rigby before that day?

A.     Carmen Rigby?

Q.     Did you know her?

A.     Yes, sir.

Q.     Did you see her in the store?

A.     Yes.  I saw her the same time I saw Robert and BoBo.  See, I was standing right in, in the middle of all three of them.

Throughout the remainder of the trial, the prosecution continued to refer to all four individuals who had been killed through the testimony of its witnesses and through the evidence it introduced.

¶28.     "Evidence of prior offenses committed by a defendant, not resulting in a conviction, is generally inadmissible either for impeachment purposes or as a part of the State's case in chief." *Neal v. State*, 451 So. 2d 743, 758 (Miss. 1984) (citing *Mason v. State*, 429 So.2d 569, 572-73 (Miss. 1983); *Gray v. State*, 351 So.2d 1342 (Miss. 1977); *Mills v. State*, 304 So.2d 651 (Miss. 1974); *Allison v. State*, 274 So.2d 678 (Miss. 1973)) . "On the other hand, our law recognizes certain exceptions to the rule. Proof of another crime is admissible where the offense charged and that offered to be proved are so interrelated as to constitute a single transaction or occurrence or a closely related series of transactions or occurrences." *Id.* at 759.  As stated above, Miss. R. Evid. 404(b) provides that "evidence of other crimes may be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  The Court in *Brown v. State*, 483 So.2d 328 (Miss. 1986), stated:

> This state has long adhered to the rule that the issue on a criminal trial should be single and that the evidence should be limited to what is relevant to the 'single' issue. Evidence of a prior criminal activity on the part of one criminally accused is inadmissible where the prior offense has not resulted in a conviction. We have held, however, that the State has a 'legitimate interest in telling a rational and coherent story of what happened....' Where

substantially necessary to present to the jury 'the complete story of the crime' evidence or testimony may be given even though it may reveal or suggest other crimes.[1]

*Id.* at 330 (citations omitted) (emphasis added). *See also Davis v. State*, 530 So.2d 694 (Miss. 1988);

*McFee v. State*, 511 So.2d 130 (Miss. 1987); *Robinson v. State*, 497 So.2d 440 (Miss. 1986);

*Davis v. State*, 476 So.2d 608 (Miss. 1985).

¶29.    In *Mackbee*, the State was dealing with two crime scenes and two bodies found in the trunk of

the defendant's car.  This Court held there was a "substantial justification" in referring to both bodies. 575

So. 2d at 28.  Because the investigating officers were forced to testify as to what they discovered at the

scene of the crime, their responses regarding the bodies were unavoidable. *Id.*

> Simply put, the investigators did not know that Mackbee would be charged in separate
> indictments for the murders. They did not know that they would have to fix their cameras
> in such an angle which would do the impossible--photograph only one body in the trunk.
> The only way they could do this was to remove one body from the top of the other. Of
> course this would lead them open to an accusation of tampering with the evidence. On the
> contrary, the investigators properly memorialized the scene of the crime, and this was
> essential in establishing Montgomery's cause of death. The officers had to do it that day
> (i.e., take the pictures of the scene as found) for they could not reconstruct the scene on
> the day of the trial to conform with the prosecutor's decisions in prosecuting the case.

*Id.*  This Court further held the prosecutor was allowed to mention the bodies in closing arguments because

it allowed him to "relay the state's story in a complete and coherent manner." *Id.* at 29.

¶30.    In *Ladner v. State*, 584 So. 2d 743 (Miss. 1991), the State was also dealing with two bodies

found at the crime scene.  This Court held the references made to the second victim were necessary to tell

the complete story of the crime. *Id.* at 758.  In overruling a motion for a mistrial, the trial judge stated:

---

[1]This case was tried in March, 1985, prior to the enactment of the Mississippi Rules of Evidence, and while this case was decided on appeal in February, 1986, there is, understandably, no mention of the Mississippi Rules of Evidence in this Court's opinion.

13

> As to the second victim at the scene, the two cases are so intertwined it's impossible as we discussed in pretrial, to disassociate one from the other. There must be some lapping into the second victim because the second victim was found right there at the scene with a bullet in her head, too. *They can't go into the detail that they could go into if the defendant were on trial for the second victim today*, but there is necessarily going to have to be some testimony that concerns itself with the other capital murder charge.

*Id.* (emphasis added). Because both victims were killed with the same gun in the same location, this Court found this argument to be without merit. *Id.*

¶31.    In *Neal v. State*, 451 So. 2d 743, 759 (Miss. 1984), the Court found that the defendant's confession of two other murders was admissible because "they were integrally related in time, place and fact with the murder" of which the defendant was being tried. *See also Johnson v. State*, 416 So.2d 383, 387 (Miss. 1982). This Court held there was no error in allowing evidence of the other murders to be presented to the jury because "[w]e are concerned here with the State's legitimate interest in telling a rational and coherent story of what happened to [the victim]." *Neal*, 451 So. 2d at 759. This Court held that the confession would not have been coherent, rational, or worthy of belief if the other crimes were dissected from the statement. *Id.*

¶32.    But there have been cases where this Court has held it is not always necessary to tell the complete story by introducing evidence of other victims from the crime scene. As he did in his first appeal before this Court, Flowers has relied on *Stringer v. State*, 500 So. 2d 928 (Miss. 1986), to in turn aver that the prosecution presented this case as "part of an overall scheme" to try Flowers for the murders of all four victims. In *Stringer*, this Court held the defendant did not receive a fair sentencing trial due to the improper conduct of the State during the sentencing phase of the trial. *Id.* at 946.

¶33.    The defendant in *Stringer* was on trial for the murder of Mr. McWilliams. However, photographs of Mrs. McWilliams were introduced into evidence during the testimony of the officer who found the bodies

14

of Mr. and Mrs. McWilliams and then used during the testimony of both the officer and the pathologist. *Id.* at 934. Slides of her body were also shown during closing argument in both the guilt phase and the sentencing phase. *Id.* The pictures of Mrs. McWilliams were not overly gruesome, but the "question in the case was primarily only of relevance--were the photographs of Mrs. McWilliams's body necessary to establish the guilt of Jimbo Stringer in the murder of Mr. McWilliams?" *Id.*

¶34. "It has long been the position of this Court that photographs of bodies may be admitted into evidence where they have probative value, and where they are not so gruesome as to be overly prejudicial and inflammatory." *Id.* *See also* **Johnson v. State**, 476 So.2d 1195, 1206 (Miss. 1985); **Cabello v. State**, 471 So.2d 332 (Miss. 1985). However, by again referring to **Stringer**, we note language that is also applicable in the case sub judice:

> While the introduction of these pictures, in itself, did not constitute reversible error, the pictures must have had a highly inflammatory effect on the jury. First, the pictures were part of an overall scheme to, in effect, try Jimbo Stringer for the murders of both Ray McWilliams and Nell McWilliams. The prosecution introduced extensive evidence about both murders....Second, the prosecution could not be content with merely introducing the photographs of Nell McWilliams into evidence, but displayed them to the jury during closing argument as part of its "slide show." We deplore this practice. As the West Virginia court noted in **Clawson**,[2] the effect is to take the pictures far beyond their evidentiary value and use them as a tool to inflame the jury.

500 So.2d at 934-35.

¶35. The facts in the case before the Court today bear a strong resemblance to those in **Stringer**. Because the issue is one of relevancy of evidence, this Court must decide whether the admission of photographs, corresponding slides, autopsy diagrams and extensive testimony regarding the killing of the three other victims constituted a tactical scheme by the State to try Flowers for all four murders during this

---

[2] **State v. Clawson**, 165 W.Va. 588, 270 S.E.2d 659 (1980).

proceeding involving only the murder of Stewart. Because the case at bar involves the same set of facts and the same defendant, only a different victim, as *Flowers I*, the analysis in *Flowers I* provides a helpful guide here.

¶36.    In *Flowers I*, this Court held:

> After a thorough review, we find that the State improperly employed a tactic or trial strategy of trying Flowers for all four murders during this trial for the murder of Tardy alone, which we cannot say did not inflame and prejudice the jury. Evidence of the other crimes was admitted which was not necessary in order for the State to prove its case in chief against Flowers for the murder of Ms. Tardy. We therefore, hold that Flowers did not receive a fair trial, and we reverse and remand for a new trial.

*Flowers I*, 773 So. 2d at 317. Because Flowers was tried on the Stewart indictment before the *Flowers I* ruling was handed down by this Court, the State was unable to correct its past mistakes, and instead, employed many of the same tactics during the second trial. However, the State should find little solace in the fact that we acknowledge here that it tried Flowers on the Stewart indictment prior to our decision in *Flowers I*, because in *Flowers I* we made no new pronouncements of law nor did we overrule any prior case or cases in reaching the conclusion we did. Instead, as noted above in reversing the conviction in *Flowers I* we applied the all-too-familiar Miss. R. Evid. 404(b)/403 balancing test based on our well-established case law interpreting these rules of evidence.

¶37.    One of the primary reasons *Flowers I* was reversed and remanded was because of the introduction of evidence of the other three victims. Bertha Tardy's body was found twenty feet away from the other bodies. However, the State insisted on introducing evidence of the other three victims through photographs of the crime scene. In the case sub judice, Stewart's body was found in close proximity to the bodies of two of the other victims. Therefore, several of the crime scene photographs would obviously show all three bodies, or in this case the two bodies and the area where Stewart's body was found. Some

16

of the crime scene photographs will understandably and unavoidably depict the bodies of other victims. However, any picture of Tardy, other than to establish the crime scene, would not be relevant. In *Flowers I* this Court listed several other errors by the prosecution which warranted a reversal such as improper questions and improper cross-examination. *Id.* at 317. Many of the same errors occurred in the second trial and other new errors were apparent.

¶38. As in *Flowers I*, Melissa Schoene, crime scene analyst, testified to many aspects of the crime scene. Through a transparency sketch of the crime scene, Schoene described for the jury where the bloody shoe prints were discovered, where Stewart's body had been positioned and the location of the other victims. She testified that she recovered a bullet projectile and fragment, Exhibits S-78 and S-79, in the area where Stewart's body had been discovered. Schoene also testified that she recovered two bullet casings for a .380 caliber pistol, Exhibits S-82 and S-83, in the same area of the store. The defense never disputed the fact that Stewart was shot by Doyle Simpson's .380 caliber pistol; it only disputed the identity of the shooter.

¶39. Schoene's testimony, which is complete, did not end at this point. The prosecution proceeded to ask Schoene questions about Exhibits S-77, S-80, S-81, S-84 and S-85. These exhibits all pertained to projectiles, fragments, casings or cartridges which were found no where near Stewart's body. Schoene's answers to the prosecution's questions about the location of where these items were found included, "near the head of Carmen Rigby," "near Robert Golden" or "near Bertha Tardy." This testimony and these exhibits were clearly not relevant to the case at bar. The State introduced another set of exhibits. Exhibits S-18, S-19, S-20, S-22, S-24, S-25, S-26, S-27 and S-31 and their corresponding slides were pictures of the crime scene. Four pictures were of Bertha Tardy, one picture was a close-up of Robert Golden, one picture was of Carmen Rigby and two pictures portrayed Golden and Rigby. Only one picture clearly

17

showed where Stewart's body had been found.  The others depicted individual shots of the other victims.

Schoene was questioned by the State about each of these pictures and was also asked to give explicit

testimony as to the wounds found on Tardy.

Q.    Exhibit 18?
A.    Okay, this is a photograph of Bertha Tardy.
Q.    Exhibit 19?
A.    This is another photograph of Bertha Tardy.  She is lying, she is the victim who was farthest back in the store, and again, here is her office door.

***

Q.    Exhibit 20?
A.    Okay, again this is victim Bertha Tardy from a slightly different angle.

***

Q.    Exhibit 22?
A.    Okay, this is a close-up photograph of Bertha Tardy.
Q.    Okay.  Were you able to determine where any wounds were on Bertha Tardy?
A.    Yes, sir.  She had some defects to her head.
Q.    And can you remember what part of the head that was?
A.    If I may refer to my notes?
Q.    Okay.
A.    (Pause)  Yes, sir.  My documentation for Bertha Tardy is that she was lying face down, head toward the west, face facing north in a pool of blood around her head and shoulders.  Her right arm is extended outward and bent at the elbow downward.  Her left arm is underneath her body.  There was a defect over her left eye, a defect behind her right ear.

***

Q.    ... Exhibit 25, can you tell us what this is?
A.    This is Exhibit 25?
Q.    Right.
A.    Okay, this is a photograph of victim Carmen Rigby.

***

Q.    Okay, and I noticed two separate pools of blood; is that correct?

18

Q.     Yes, sir.  There is a pool of blood underneath her, and there is a pool of blood coming from the fourth, the fourth area where there was blood but there was no victim.

Q.     Okay, so the pool of blood in the front of that did not come from her.  It came from where the fourth victim had been removed; is that correct?

A.     I believe so; yes, sir.

***

Q.     Exhibit number 27.
A.     Okay, this is a photograph of victim Robert Golden lying up against the counter.

¶40.    As this Court found in *Flowers I*, we also find this testimony was not relevant to the case at bar. There was no probative value in introducing the pictures of the other individual victims.  The admission of the evidence, both testimony and exhibits, was highly prejudicial to Flowers.

¶41.    It must be noted that the defense objected to the introduction of these pictures on several occasions.  An earlier Miss. R. Evid. 403 hearing had taken place with regards to general evidence of the other victims.  As to whether the evidence of the other killings would be admissible, the trial judge's ruling was as follows:

BY THE COURT:     Well, if I have not, let me rule now that I find that based- -the evidence that would show that there are other killings is, has more probative value than prejudicial effect, ***and therefore it is admissible at least to some extent.***

(emphasis added).  To further clarify as to what extent the evidence would be allowed, the trial judge also stated:

BY THE COURT:     Okay. They are entitled to show the entire, to present the jury with the entire picture. They are entitled to see what goes on at the scene. The position of the bodies in relation to each other is a relevant factor that the jury should be able to consider one way or another. ***Now what I will not allow-of course, there is a lot of cumulative evidence in regard to that. I mean once the State establishes the crime scene and all like that, there is no point in going back into it over and over and***

19

> *over again unless the State can establish some reason*
> *for that.*

(emphasis added).

¶42.    The trial judge's rulings on this issue were crystal clear and eminently correct.  The State certainly had been timely and fairly forewarned by the trial judge as to the rulings. There was never a hearing where the judge was shown the specific pictures the State intended to introduce into evidence at the trial.  The trial judge even once stated late into the trial during the direct examination of Jack Matthews, "Nobody showed me the pictures. I guess I didn't ask, but they are admitted.  They are into evidence now so- -."  The defense was objecting to the continual use of the pictures to show the jury the bodies of the other victims. Although the trial court initially ruled that it would not allow cumulative evidence of the other victims, it is clear from the record that the  State proceeded to do that which the trial judge had specifically instructed the State not to do, namely, to introduce extensive evidence beyond the "establishment of the crime scene."

¶43.    During the testimony of Dr. Steven Hayne, the State's eminently qualified pathologist, the autopsy diagrams of each victim, except Stewart, were introduced.  Dr. Hayne went into great detail regarding the injuries and the wounds of the other three victims.

> Q.    Dr. Hayne, I hand you what has been introduced in evidence as State's Exhibit 101.  Is that the diagram you just previously testified about in reference to the autopsy of Bertha Tardy?
> A.    Yes, sir.
> Q.    And I will try to shorten it some.  Did you observe any gunshot wound to her head?
> A.    I did, sir.
> Q.    Would you tell the jury about this particular gunshot wound?
> A.    It was a gunshot wound to the right side of the head, coursing across the head, exiting near the left eye, going through and through the head producing extensive injuries to the brain leading to death as well as fractures or breaking of the bone at the base of the skull, that part of the skull on which the brain sits.

***

Q.      Also, State's Exhibit 100 is the autopsy of Robert Golden.  Is that the diagram that you testified about earlier?

A.      Yes, it is the diagram that I identified; yes, sir.

Q.      That you identified earlier?

A.      Yes, sir.

Q.      Would you describe the gunshot wound that you found on the body of Mr. Golden?

A.      There was a through and through gunshot wound entering near the left ear and on the left side of the head, exiting on the right side of the head slightly behind the right ear.  There was one unusual characteristic about this gunshot wound in that there was tatooing [sic], deposits of unburned powder on the skin surface about the entrance gunshot wound which would make this a near contact gunshot wound in that the muzzle of the weapon was approximately a foot to maybe even 15 inches away from Mr. Golden's head when the handgun was fired.

Q.      Did you notice any other wounds about him, about his body?

A.      May I look at my notes, sir?

Q.      Sure.

A.      Yes, sir.

Q.      Where was that gunshot wound located, Dr. Hayne?

A.      The gunshot wound on Mr. Golden, sir?

Q.      Right.  Yes, sir.

A.      It was, it entered on the front part of the left ear, exited behind and slightly above the right ear, sir.

Q.      Describe the second wound that you--

A.      There were multiple other wounds on the body including abrasions or scrapings of the skin located on the left side of the face.  There was also a large bruise located on the front of the right arm near the right shoulder, and located within that bruise was an area of skin scraping measuring approximately an inch and a half.  There was also a bruise on the inner surface of the right arm that measured approximately one inch, and there was also a bruise located near the elbow that measured approximately an inch and a half.

***

Q.      And finally, I show you State's Exhibit 102.  Is that the diagram of the autopsy of, that you performed on Carmen Rigby?

A.      These are the diagrams of that autopsy; yes, sir.

Q.      Okay, would you describe the gunshot wound, if any, that you found on the body of Carmen Rigby, please, sir?

A.      The entrance gunshot wound was located over the back of the head, slightly to the right of the midline at a 2    point 3 inches below the top of the head and approximately 1 inch to the right of the midline of the back of the head.

21

¶44.    Amazingly, after tendering Dr. Hayne as a witness, the prosecution had to ask permission to introduce the autopsy diagram of Stewart, having forgotten to introduce it as an exhibit or question Dr. Hayne specifically about it.  In other words, even though Flowers was on trial solely for the murder of Stewart, after introducing into evidence and taking Dr. Hayne through detailed testimony as to the autopsy diagrams of the other three murder victims, Bertha Tardy, Robert Golden, and Carmen Rigby, the State, almost unbelievably, failed to introduce the autopsy diagram of Stewart, and had to seek permission  from the trial judge to have a late introduction of Stewart's autopsy diagram into evidence.  While Dr. Hayne must certainly answer questions propounded to him by the prosecution, his testimony as elicited by the State was found to be part of the overall trial tactic of the prosecution to try Flowers for all four murders in *Flowers I*, 773 So. 2d at 323.  Because essentially the same testimony was elicited at each trial, we are compelled to once again find that in the case today the prosecution was employing the same trial tactic; and therefore, the testimony must be found to be irrelevant and highly prejudicial to Flowers.

¶45.    In addition to the projectiles and casings offered into evidence during the testimony of Melissa Schoene, further testimony was given by Dr. Hayne and David Balash, a firearms examiner, as to bullets actually removed from the other victims.  Dr. Hayne testified as follows:

> Q.    I hand you State's Exhibit number 88 and 87 for identification purposes, and tell me whether or not you have ever seen those items before?
> A.    (Pause while witness examines.) Yes, sir.
> Q.    Okay, what are those items?  If you could explain to the jury what they are, please, sir?
> A.    These are on Mr.-- well, the first item, State's 87 shows fragments of the bullet recovered from Mr. Golden. State's 88 shows fragments of the bullet recovered from Carmen Rigby.
> Q.    Where did you recover the projectile in 88 from Carmen Rigby?  Was that actually out of her skull, out of her head?
> A.    That's correct, sir.
> Q.    And also from Mr. Golden, was it recovered?
> A.    Parts of the bullet, yes, sir.

22

Q. Okay, the condition of the one recovered from Mr. Golden's head, do you recall whether or not what type of condition it was in?
A. Markedly deformed.
Q. And what about the one out of Ms. Rigby's head?
A. Markedly deformed fragments.

Again the defense never disputed the fact that Stewart was killed by Doyle Simpson's .380 pistol. The State argues that it was necessary to introduce all bullets to tie in evidence to the gun, but this Court cannot find the relevancy in this evidence. It was clearly introduced in furtherance of the State's trial tactic of trying Flowers for all four murders.

¶46. Chief Hargrove and Sam Jones were asked to testify as to their personal relationships with the other victims. Chief Hargrove stated he had "[b]een knowing [Robert Golden] a long time [and] [w]hen [Chief Hargrove's brother] come home, [Robert Golden] used to come over to [Chief Hargrove's] mother's house and eat." The following exchange took place between the prosecution and Sam Jones in regards to Robert Golden:

Q. ...Is that a photograph [shown Exhibit S-26, picture of Robert Golden] of the condition that you saw Mr. Golden at the time you entered the store?
A. No, sir. It wasn't.
Q. What is different about it?
A. What is different about it, he was, when I saw him, he was sitting, leaning up against the counter like this. This hand, his left hand was on the floor. His right hand was across here.
Q. Okay, was he sitting up, or was he on the floor?
A. He was sitting up back against the counter, and he had his right hand was laying up here, and his left hand was laying on the floor.
Q. Okay.
A. Flat on the floor.
Q. Okay, is that Mr. Golden though? Do you remember seeing him? I know you may not be able to see his face, but does that appear to be Mr. Golden?
A. It seems to be, but I can't see his face.
Q. I will show you another exhibit. State's Exhibit number 27.
A. That's him there.
Q. Okay. Mr. Jones, did it appear that Mr. Golden was alive or dead at the time that you saw him. Could you tell whether or not he was alive or dead? Mr. Golden.

> A. Repeat the question again.
> Q. Did it appear to you that Mr. Golden was alive or dead at the time that you saw him?
> A. He was, he appeared to be dead. Yes.

This testimony, like so much in *Flowers I*, wherein Mrs. Tardy was the victim, is clearly not relevant to the killing of Stewart. In *Flowers I*, Jones testified in great detail about finding Stewart's body, his condition and even the sounds he made. But in the case at bar, the prosecution chose to focus more on Jones's personal relationship with Golden and the crime scene as it related to that particular victim.

¶47. Cases such as *Mackbee, Ladner* and *Neal*, illustrate the necessity of telling the jury the complete story. But the case sub judice is only illustrative of a trial tactic employed by the State in an attempt to try Flowers for all four murders. It was clearly necessary for the State to introduce some evidence to the jury pertaining to the other three victims to ensure a complete and rational story. But here the State crossed the line, a line which was established by the trial judge during a pretrial ruling. The jury should have been allowed to see only those pictures necessary to depict the crime scene. Close-ups of other victims lying in pools of blood did nothing to help prove the State's case against Flowers in the killing of Stewart. Those pictures only helped to inflame and prejudice the jury and to remind the jury that four people were killed that day at Tardy Furniture.

¶48. This Court also finds the State went too far in allowing its witnesses to testify as to the specific wounds of the other three victims using the autopsy diagrams. This line of testimony is further evidence of the trial tactic and strategy employed by the State to try Flowers for all four murders. The State also entered every bullet and every casing into evidence, including the ones found by Bertha Tardy who was shot in a different location and the bullet fragments which were recovered from the other victims. The

24

defense never disputed Stewart was shot with Doyle Simpson's gun. It was not necessary for the State's case as to the Stewart killing to introduce all the fragments and casings found.

¶49.    The State of Mississippi, by and through the various offices of the District Attorneys, is acting totally within its authority in seeking and receiving multi-count indictments from the county grand juries in certain specified instances as provided by statute and rule. *See* Miss. Code Ann. § 99-7-2 (Rev. 2000); URCCC 7.07. Upon the return of a multi-count indictment, the trial court in the exercise of sound discretion and on motion of the State or the defendant, may grant a severance of offenses. However, as to Flowers, there were four separate indictments returned against him, one for each of the victims. Again, notwithstanding the statutory authority which has existed since 1986 for one or more defendants to be charged in a multi-count indictment in certain instances, there is no legal prohibition against a defendant such as Flowers being charged in separate indictments for each of the offenses, thus resulting in separate trials on each indictment. Indeed, there is no mystery as to why the State might choose to proceed as it did against Flowers -- the odds are much better from the State's viewpoint as far as securing at least one conviction and what might be deemed to be an appropriate sentence. On the other hand, if the State in this case were so insistent in presenting at trial all the evidence that was presented as to all four victims, it need only to have left viable its initial motion to consolidate the four cases (which Flowers had not opposed), instead of withdrawing the motion, or at least conceded Flowers's later motion to consolidate the cases instead of opposing the motion. Agreed consolidation of multiple indictments for trial purposes in certain instances certainly is not foreign to Mississippi criminal procedure. *See **Frost v. State***, 453 So.2d 695, 696 (Miss. 1984).

¶50.    At oral argument in this case, the State argued, inter alia, that since Flowers's trial here on the Derrick Stewart indictment was based purely on circumstantial evidence, thus resulting in the State being

25

required to prove Flowers's guilt not only beyond a reasonable doubt, but also to the exclusion of every reasonable hypothesis consistent with innocence, the State was not only permitted, but obligated, to present extensive evidence of homicide as to all four victims in order to exclude any hypothesis which might be deemed to be consistent with innocence. Interestingly, but not surprisingly, the State offers no authority for this proposition. Again, we emphasize that although the learned trial judge correctly ruled that in order to convey the "entire picture" the State could offer evidence of the crime scene, including location of the bodies, the trial judge, in his pre-trial ruling, also correctly limited the State's presentation of the evidence by disallowing "cumulative evidence....once the State establishes the crime scene." Notwithstanding the trial court's initial proper evidentiary rulings, the State chose to go far beyond the trial court's ruling, and when the State chose this course of action, it did so at its own peril.

¶51.    All of this having been stated on this issue, in the end, the question which must be asked is whether the evidence introduced by the State was relevant, or necessary, to establish the guilt of Flowers in the murder of Derrick Stewart, and only Derrick Stewart. This Court holds the cumulative evidence of the photographs, the autopsy diagrams and the testimony regarding the other individual victims were neither relevant nor necessary to the case sub judice, and were, therefore, highly prejudicial to Flowers. The State's pattern of continuously referring to the killing of the other three victims throughout the entire guilt phase denied Flowers his fundamental right to a fair trial.

> **II.    WHETHER FLOWERS WAS DENIED HIS FUNDAMENTAL AND CONSTITUTIONAL RIGHT TO A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT.**

¶52.    Flowers next argues that prosecutorial misconduct occurred at several stages throughout the trial. Flowers asserts that these individual occurrences and their cumulative effect denied him his right to a fair trial.  The State argues several of Flowers's cited occurrences are procedurally barred by lack of

26

contemporaneous objections. Flowers contends that objections were made in almost all of the instances, and that even if objections were not made, the plain error rule should apply. While some of these allegations of error are procedurally barred, we will address the merits of the underlying claims in the order raised by Flowers, knowing that any subsequent review will stand on the procedural bar alone. *Chase v. State*, 645 So.2d 929, 845 (Miss. 1994); *Foster v. State*, 639 So.2d 1263, 1270 (Miss. 1994).

> [I]t is the duty of a trial counsel, if he deems opposing counsel overstepping the wide range of authorized argument, to promptly make objections and insist upon a ruling by the trial court. The trial judge first determines if the objection should be sustained or overruled. If the argument is improper, and the objection is sustained, it is the further duty of trial counsel to move for a mistrial. The circuit judge is in the best position to weigh the consequences of the objectionable argument, and unless serious and irreparable damage has been done, admonish the jury then and there to disregard the improper comment.

*Johnson v. State*, 477 So.2d 196, 209-10 (Miss. 1985). *See Wilson v. State*, 234 So.2d 303, 308 (Miss. 1970); *Aldridge v. State*, 180 Miss. 452, 456, 177 So. 765 (1938); *Matthews v. State*, 148 Miss. 696, 791, 114 So. 816 (1927). However, heightened scrutiny applies in death penalty cases. Plain error will apply to the issues we discuss hereafter. *Foster v. State*, 639 So.2d at 1289 (citing *Gray v. State*, 487 So.2d 1304, 1312 (Miss. 1986) ("defendant who fails to make a contemporaneous objection must rely on plain error to raise the assignment on appeal")). Two of Flowers's sub-claims regarding prosecutorial misconduct warrant discussion: (1) the attempted impeachment of witnesses by the prosecutor without a factual basis, and (2) the prosecutor's arguing of facts not in evidence.

### A. Whether the Prosecutor Improperly Attempted the Impeachment of Witnesses Without Factual Basis.

¶53. Flowers argues the prosecution committed reversible error by arguing facts not in evidence when the prosecutor on cross-examination accused Latarsha Blissett, Stacey Wright and Mary Ella Fleming of harassing Clemmie Fleming and allegedly trying to get her to give false testimony. Flowers contends this

27

same tactic was used by the State in *Flowers I* during the cross-examination of Connie Moore. The State argues that any impeachment questions were supported by the testimony of Investigator John Johnson.

¶54. Miss. R. Evid. 613, which governs prior statements of witnesses, provides:

> (a) Examining Witness Concerning Prior Statement. In examining a witness concerning a prior statement made by him, whether written or not, the statement need not be shown nor its contents disclosed to him at that time, but on request the same shall be shown or disclosed to opposing counsel.
> (b) Extrinsic Evidence of Prior Inconsistent Statement of Witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an *opportunity to explain or deny* the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 801(d)(2).

(emphasis added). It is no longer required that the witness be directed to the statement on cross-examination as to a particular time or sequence, but the witness should be given an opportunity to explain the statement. *See* Miss. R. Evid. 613 & cmt. This Court has held that a stricter standard should be followed, and we have, therefore, required the questions to include, "whether or not on a specific date, at a specific place, and in the presence of specific persons, the witness made a particular statement." *Carlisle v. State*, 348 So.2d 765, 766 (Miss. 1977) (citations omitted). "Then with the predicate properly laid, the witness may be impeached by showing prior statements inconsistent with the in-court testimony, so long as the statement made in court is one relevant to the issue in the case and therefore not collateral." *Id.* (citing *Williams v. State*, 73 Miss. 820, 19 So. 826 (1896), *aff'd*, 170 U.S. 213, 18 S.Ct. 583, 42 L.Ed. 1012 (1898)).

¶55. As we stated in *Flowers I*, it is of the utmost importance that counsel have "a good faith basis for any question asked on cross-examination; therefore, counsel may not use prior inconsistent statements as a 'guise of impeachment for the *primary* purpose of placing before the jury substantive evidence which is not otherwise admissible.'" 773 So. 2d at 326-27 (citing *Harrison v. State*, 534 So.2d 175, 178

28

(Miss. 1988) (citations omitted) (emphasis in original); *Foster v. State*, 508 So.2d 1111, 1115 (Miss. 1987)). This Court has stated:

> The asking of questions without a factual basis leaves an impression in the mind of jurors that the prosecutor actually had such facts in hand and that the insinuations through questioning contained some truth. This leaves false and inadmissible ideas in the minds of jurors that cannot be adequately rebutted by the testimony of witnesses or instructions from the court.

*Walker v. State*, 740 So. 2d 873, 884 (Miss. 1999).

¶56. In *Flowers I*, the State attempted to impeach the defense witness, Connie Moore. *Id.* 773 So. 2d at 327-28. On direct examination, Moore testified that she bought a pair of Fila Grant Hill tennis shoes for her son. *Id.* at 328. On cross-examination, the State tried to show Moore had, in fact, bought them for Flowers. *Id.* During her testimony, the State asked Moore if Patricia Hollman was with her when she purchased the shoes. *Id.* Moore stated Hollman was not present when she bought the shoes. *Id.* Moore also testified that she did not tell Hollman she was buying the shoes as a gift for Flowers. *Id.*

¶57. After this particular questioning, this Court held the proper predicate for impeachment had been laid. *Id. See also Carlisle v. State*, 348 So.2d at 766. This Court further held the State was required to either continue with the impeachment by showing a basis in fact for the questions or offer a witness in rebuttal to prove the truth of the prior statement. *Flowers I*, 773 So. 2d at 328. Because the State had no basis in fact to make the claim and because on rebuttal the State never refuted Moore's denial, this Court found the State's tactic to be in bad faith. *Id.* Although Patricia Hollman was called as a witness by the State, she was never questioned about either being present when Moore bought the shoes or hearing Moore state for whom she was buying the shoes. *Id.* Hollman was not called as a rebuttal witness after

the State posed these particular questions to Moore. *Id.* This Court held this was clearly error by the State.

¶58. In the case sub judice, Flowers again argues that the State improperly attempted to impeach three witnesses without presenting a factual basis: Latarsha Blissett, Mary Ella Fleming and Stacey Wright. When cross-examining Flowers's witnesses, the State accused the witnesses of "harassing" their witnesses. During the cross-examination of Latarsha Blissett, the prosecutor asked her if she had tried to get Clemmie Fleming to lie for Flowers in order to get him out of jail, and if she and other family members had harassed Fleming in an effort to get her to change her story. The prosecution cross-examined Mary Ella Fleming on the premise that she had attempted to have Clemmie Fleming testify in such as way as to "save" Flowers. Also, Stacey Wright was cross-examined by the prosecution in such a way as to infer that she and others had been harassing Clemmie Fleming to get her to change her testimony.

¶59. After the above cross-examination was complete, the proper predicate for impeachment was laid. *Flowers I*, 773 So. 2d at 328. *See also Carlisle v. State*, 348 So. 2d at 766. According to *Flowers I*, the State was required to "continue with the impeachment and show a basis in fact for the question, or to offer a subsequent witness in rebuttal to prove the statement[s] [were] true that [the witnesses] lied." 773 So. 2d at 328. The State called Clemmie Fleming as a rebuttal witness, but on direct examination, the prosecutor failed to question Fleming about whether Latarsha Blisset, Mary Ella Fleming or Stacey Wright ever harassed her or asked her to lie. However, on redirect, the prosecution asked Fleming, "[w]ho, if anyone, asked you to lie in relationship to this case?" Fleming responded, "Mary Fleming." Defense counsel immediately objected and asked the answer be stricken because he had no ability to cross-examine. The trial court asked the jury to disregard the witness's last statement and excused Fleming.

¶60.    The State argues this claim is factually distinguishable from the defense's argument in *Flowers I*. The State contends the impeachment questions in the case sub judice were supported by the testimony of Investigator John Johnson. The State points out that when Clemmie Fleming was interviewed by Johnson, she was "real nervous and upset." Although Johnson testified that Fleming did tell him why she was upset, he was not allowed to testify to any statements made by Fleming because of hearsay. Contrary to the contentions of the State, there is no evidentiary basis for this line of questioning.

¶61.    This Court has clearly held that "it is prejudicial error for questions on cross-examination to contain insinuations and intimations of such conduct when there is no basis in fact." *Walker*, 740 So. 2d at 884 (citing *Hosford v. State*, 525 So.2d 789, 793 (Miss. 1988)). Here, the only attempt by the prosecutor to prove that the three defense witnesses lied during cross-examination about statements made to Clemmie Fleming was to ask one question during redirect that was stricken from the record. This Court finds error in the State's failure to offer proof that Latarsha Blissett, Stacey Warren and Mary Ella Fleming lied. This line of questioning without evidentiary basis has been found by this Court to be inflammatory and highly prejudicial. This Court holds it was prejudicial to the case at bar.

**B.    Whether The Prosecutor Argued Facts Not In Evidence During Closing Arguments.**

¶62.    Flowers also argues both the District Attorney and the Assistant District Attorney, in their closing arguments, argued facts not in evidence. Flowers cites to several specific examples in each closing argument where the State argued facts not in evidence. In response, the State tries to connect the comments made in the closing arguments to the proper testimony on which they were based.

¶63.    The standard of review which this Court must apply to lawyer misconduct during opening statements or closing arguments is "whether the natural and probable effect of the improper argument is to

31

create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." **Sheppard v. State**, 777 So. 2d 659, 661 (Miss. 2001) (citing **Ormond v. State**, 599 So.2d 951, 961 (Miss. 1992)).

¶64.    Attorneys are afforded wide latitude in arguing their cases to the jury, but they are not allowed to employ tactics which are "inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury." **Sheppard**, 777 So.2d at 661 (citing **Hiter v. State**, 660 So.2d 961, 966 (Miss. 1995)). The purpose of a closing argument is to fairly sum up the evidence. **Rodgers v. State**, 796 So. 2d 1022, 1027 (Miss. 2001). The State should convey those facts which the prosecution asserts a verdict of guilty would be proper. **Clemons v. State**, 320 So.2d 368, 370 (Miss. 1975). "The prosecutor may comment upon any facts introduced into evidence, and he may draw whatever deductions and inferences that seem proper to him from the facts." **Bell v. State**, 725 So.2d 836, 851 (Miss. 1998) (collecting authorities). Counsel "cannot, however, state facts which are not in evidence, and which the court does not judicially know, in aid of his evidence. Neither can he appeal to the prejudices of men by injecting prejudices not contained in some source of the evidence." **Nelms & Blum Co. v. Fink**, 159 Miss. 372, 131 So. 817, 821 (1930). *See also* **Sheppard**, 777 So.2d at 661.

¶65.    "In appropriate circumstances, prosecutorial misconduct has been the basis for reversal of a defendant's conviction and sentence." **Chase**, 645 So.2d at 853. However, in discussing the broad latitude afforded attorneys in making their closing arguments, this Court has stated:

> Counsel was not required to be logical in argument; he is not required to draw sound conclusions, or to have a perfect argument measured by logical and rhetorical rules; his function is to draw conclusions and inferences from evidence on behalf of his client in whatever he deems proper, so long as he does not become abusive and go outside the confines of the record.

*Brown v. State*, 690 So.2d 276, 296 (Miss. 1996)(quoting *Johnson v. State*, 416 So.2d 383, 391 (Miss. 1982)).  Indeed, we have held that "the prosecutor may comment on facts in evidence and may draw proper deductions there from."  *Id.*

> A defendant is entitled to a fair and impartial trial before a jury not exposed to abusive arguments appealing to their passions and prejudices. Although ours is an adversary system, prosecuting attorneys must exercise caution and discretion in making extreme statements in their arguments to the jury, if for no other reason than to save themselves, the defendant, the court and the jury the additional time, expense and effort involved in a retrial.

*Dunaway v. State*, 551 So. 2d 162, 163-64 (Miss. 1989)(citing *Keyes v. State*, 312 So.2d 7, 10 (Miss. 1975)). *See also* *Stewart v. State*, 263 So.2d 754, 758 (Miss. 1972).

¶66.    Where the argument does not result in "unjust prejudice against the accused as to result in a decision influenced by the prejudice so created," this Court will find it harmless. *Wells v. State*, 698 So.2d 497, 507 (Miss. 1997) (quoting *Davis v. State*, 684 So.2d 643, 656 (Miss. 1996); *Davis v. State*, 530 So.2d 694, 701 (Miss. 1988)).

¶67.    In *Harvey v. State*, 666 So. 2d 798 (Miss. 1995), this Court found the defendant's issue regarding the State's improper closing argument to be meritorious.  This Court held the prosecutor crossed the line and proceeded outside of the record when the State told the jury the defense threatened a witness to keep her from testifying at the trial.  *Id.* at 801.  This Court determined:

> The prosecutor's comment of "somebody connected with the defense" and "they threatened her," could be interpreted as referring to Harvey, other defense witnesses, or even defense counsel. The prosecutor should have limited his comments in argument to Brown's state of mind of being fearful at the time she testified. His failure to do so makes the verdict suspect as to whether Harvey received a fair trial.

*Id.*  This Court further held "the natural and probable effect of the prosecutor's improper argument was to create unjust prejudice against Harvey so as to result in a decision by the jury which this Court cannot say

33

with any degree of certainty was not influenced by prejudice." *Id.  See **Johnson v. State***, 596 So.2d 865 (Miss. 1992).

¶68.    Flowers cites to at least fourteen different comments by the State which he believes are improper. Over one-half of the comments relate to the State's accusing the defense witnesses of either changing their stories or trying to get prosecution witnesses to lie for the defendant.  The State lists several examples of testimony upon which it contends the comments were based.  In one comment, the prosecution stated that the defense witnesses tried to force their prosecution witnesses to lie.

> BY MR. EVANS:    You have heard testimony how the defense witnesses tried to get our witnesses to lie, to come into court and change their story and say that he was not the person. You have seen that happen in this courtroom before your very eyes.
>
> ***
>
> [Curtis Flowers] got rid of [the Fila tennis shoes], but he couldn't get rid of the witnesses. They tried to force them to lie. They put pressure on them.

¶69.    Because this Court held the State improperly impeached Latarsha Blissett, Stacey Warren and Mary Ella Fleming, there is no evidentiary basis for this statement. But as stated above, attorneys are afforded wide latitude in arguing their case to the jury.  A prosecutor is allowed to draw whatever deductions and inferences that seem proper from the facts. Testimony was before the jury of one witness, Roy Harris, changing his story.  The trial court also gave an instruction to the jury which said:

> BY THE COURT:    Arguments, statements and remarks of counsel are intended to help you understand the evidence and apply the law, but are not evidence. If any argument, statement or remark has no basis in the evidence, then you should disregard that argument, statement or remark.

¶70.    "The test to make such determination is whether the natural and probable effect of improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by

prejudice." ***Harvey***, 666 So.2d at 801 (citing ***Johnson v. State***, 596 So.2d 865, 869 (Miss. 1992)). By specifically accusing the defendant and the defense of trying to coerce prosecution witnesses into lying, the State attempted to create a prejudice against Flowers that would influence the jury.

¶71.    The remaining comments cited by the defense concern alleged misstatements of facts by the prosecution.  Two examples cited by Flowers involve the prosecutor's closing arguments to the jury about the testimony of Sam Jones and Robert Campbell.  The prosecutor argued Jones had testified that at 9:30 a.m., he received a call from Bertha Tardy to come to the store, while defense counsel asserted in his objection that Jones had testified that he received the call at 9:00 a.m. and arrived at the store at 9:30 a.m. After the trial judge  ruled that the jury would recall the evidence and that "[t]his is argument," the prosecutor fired the last shot by stating before the jury, "[Jones] said he received a call around 9:30.  I recall; I wrote it down."  Additionally, the prosecutor argued to the jury that Campbell had testified that Flowers was mad because Mrs. Tardy had terminated his employment and was holding money out of his paycheck to cover the damaged batteries.  Defense counsel objected on the basis that the prosecutor was mischaracterizing Campbell's testimony, and when the prosecutor responded that he was quoting verbatim from his notes, the trial court overruled the defense objection.

¶72.    After a thorough examination of the record, it is clear from Jones's testimony that he testified he arrived at Tardy's at 9:30.  He never once stated he was called at 9:30 on the morning of July 16, but he did testify he arrived at the store around 9:30.  On direct examination, the State never questioned Jones about a specific time.  He only stated he received a call from Mrs. Tardy on the morning of July 16.  On cross-examination, Jones was asked what time he arrived at Tardy's, and he answered that it was around 9:30.

35

¶73. The second exchange involves the testimony of defense witness, Robert Campbell. After a thorough examination of the Campbell's testimony, it is clear Campbell never testified Flowers was upset at Mrs. Tardy. The State never questioned Campbell about Flowers's feelings toward Tardy or about any money. On redirect, Campbell was asked if Flowers ever mentioned anything was wrong with Mrs. Tardy and, Campbell stated Flowers never mentioned anything to him.

¶74. Flowers lists several other instances where the State misstated testimony of witnesses. The cumulative effect of the State's repeated instances of arguing facts not in evidence was to deny Flowers his right to a fair trial.

### III. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR DURING THE SENTENCING HEARING BY FAILING TO ANSWER THE JURY'S QUESTION.

¶75. Flowers next argues the trial court had the authority to answer the question asked by the jury during sentencing deliberation. Flowers specifically contends the trial court had authority to tell the jury that "life without parole is life without parole." The State argues Flowers received the instruction he requested and waived any objection with regard to the instruction.

¶76. The question asked by the jury was, "If Curtis Flowers gets imprisonment without parole-Does that mean he will never get out of prison?"[3] The defense asked for the court to instruct the jury that "life without parole is life without parole." The trial court decided that because he had no authority to answer the jury's question, he would refer them back to the instructions previously given by the court. The counsel for the defense then asked the trial judge to refer to Instruction Number One, which specifically dealt with the sentencing options. Sentencing Instruction Number One stated in pertinent part:

---

[3]As required by URCCC 3.10, the question was reduced to writing, and the trial judge followed the correct procedure in dealing with the question.

36

BY THE COURT:  You have found Curtis Giovanni Flowers guilty of the crime of capital murder. You must now decide whether Curtis Giovanni Flowers will be sentenced to death or life imprisonment without parole.

After each side agreed to waive any objections, the trial court sent a note back to the jury saying, "You should refer to Sentencing Instruction number 1."

¶77.    According to Miss. Code Ann. § 97-3-21, "[e]very person who shall be convicted of capital murder shall be sentenced (a) to death; (b) to imprisonment for life in the State Penitentiary without parole; or (c) to imprisonment for life in the State Penitentiary with eligibility for parole as provided in Section 47-7-3(1)(f)." Miss. Code Ann. § 99-19-101(1) states in pertinent part that "[u]pon conviction or adjudication of guilt of a defendant of capital murder or other capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death, life imprisonment without eligibility for parole, or life imprisonment." Miss. Code Ann. § 47-7-3(1)(f) states "[n]o person shall be eligible for parole who is charged, tried, convicted and sentenced to life imprisonment under the provisions of Section 99-19-101." The reading of these statutes together indicate that a defendant on trial for capital murder may only be sentenced to death or life imprisonment without the eligibility of parole. According to § 47-7-3(1)(f), there is no longer the possibility of life imprisonment. By giving only the sentencing options of death or life imprisonment without parole, the trial judge properly gave the jury all the instructions that were needed.  *See **Pham v. State***, 716 So.2d 1100, 1103-04 (Miss. 1998).

¶78.    This Court has repeatedly held that except in habitual offender cases, where a life sentence would automatically mean life without parole, the parole issue should not be considered by the sentencing jury. ***Smith v. State***, 724 So.2d 280, 293-94 (Miss. 1998); ***Blue v. State***, 674 So.2d 1184, 1194-96 (Miss.

37

1996); *Mackbee v. State*, 575 So.2d 16, 40-41 (Miss. 1990); *Williams v. State*, 544 So.2d 782, 798 (Miss. 1987); *Cabello v. State*, 471 So.2d 332, 346 (Miss. 1985). In this state's original case on this issue, *Williams v. State*, 445 So.2d 798, 812-14 (Miss. 1984), this Court held that:

> A jury should have no concern with the quantum of punishment because it subverts a proper determination of the sentencing issue.
>
> Reference to the possibility of parole should the defendant not be sentenced to die are wholly out of place at the sentencing phase of a capital murder trial for two additional reasons.
>
> First, such references inevitably have the effect of inviting the jury to second guess the Legislature. The Legislature has declared that persons sentenced to life imprisonment may under certain circumstances become eligible for parole. Miss. Code Ann. § 47-7-3(1) (Supp. 1982). It is no more proper for the jury to concern itself with the wisdom of that legislative determination than it is for the jury to consider the Legislature's judgment that death in the gas chamber be an authorized punishment for capital murder. *Johnson v. State*, 416 So.2d 383, 392 (Miss. 1982).
>
> Second, parole is not automatic. No person sentenced to life imprisonment has any "right" to parole. *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 11, 99 S.Ct. 2100, 2105, 60 L.Ed.2d 668, 677 (1979); *Davis v. State*, 429 So.2d 262, 263 (Miss. 1983). Allowing argument or testimony regarding the possibility of the defendant some day being paroled is in effect inviting the jury to speculate how *ten years in the future* the parole board may exercise its legislatively granted discretionary authority. This would introduce into the sentencing proceedings an "arbitrary factor" proscribed by section 99-19-105(3)(a).

*Williams*, 445 So.2d at 813 (emphasis in original). This Court has reaffirmed this holding on several occasions. *See Smith v. State*, 724 So.2d 280, 293-94 (Miss. 1998); *Blue v. State*, 674 So.2d 1184, 1194-96 (Miss. 1996); *Mackbee v. State*, 575 So.2d 16, 40-41 (Miss. 1990); *Williams v. State*, 544 So.2d 782, 798 (Miss. 1987); *Cabello v. State*, 471 So.2d 332, 346 (Miss. 1985).

¶79.    This Court has also cautioned judges against making any comments, or giving instructions to the jury after it retires to reach a verdict. *Haynes v. State*, 451 So. 2d 227, 231 (Miss. 1984).

In this case the jury had already been amply instructed, indeed, more than amply instructed in S-4. There was no need to further instruct them. While the circuit judge was undoubtedly trying to deal with a vexing type of problem as best he could, we believe the proper response to the jury would have been that they had already been properly instructed on this question and to read their instructions.

*Id.* We agree with the Court in *Haynes* in determining the jury in the case sub judice was amply instructed as to the sentencing options. Unlike the trial judge in *Haynes*, this trial judge in the case before us today correctly instructed the jury to refer back to the instructions which had been previously given. Also pursuant to the applicable statutes, the trial judge properly instructed the jury on the appropriate sentencing options. This issue is without merit.

### VI.   WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY OVERRULING FLOWERS'S OBJECTIONS TO THE OPINION AND HEARSAY TESTIMONY OF JOE ANDREWS.

¶80.   Flowers argues that the evidence put on by the prosecution through one of their experts, Joe Andrews, was based solely on hearsay. The State argues the trial court did not abuse his discretion in admitting the disputed evidence because, as an expert, Andrews is entitled to rely on hearsay to form his opinions.

¶81.   At trial Flowers objected to Andrews testifying about the shoe impression found at the crime scene because he believed the analysis was based on hearsay. The trial court overruled the objection and allowed Andrews to testify regarding the shoe impression.

¶82.   Andrews, an employee of the Mississippi Crime Lab, was qualified as an expert in the field of forensic microanalysis. As indicated earlier, photographs were taken from the scene which depicted footprints. From those photographs, Andrews determined the prints were of footwear, or shoe impressions. After determining the photographs were of footwear impressions, Andrews next compared the photographs with a pair of shoes taken from the defendant. The shoes, a pair of Nike Flight tennis

39

shoes, were not consistent with the type of shoe that left the impression at Tardy's. Andrews then visited several athletic stores, and found a design that was very similar to the design in the photograph. The design was found on a pair of Fila athletic shoes.

¶83. The shoe box found at Connie Moore's home was submitted to Andrews and the Mississippi Crime Lab for the examination for latent prints. After noticing that the shoe box originally contained a pair of Fila Grant Hill II MID shoes, Andrews suggested the Highway Patrol purchase a similar pair of shoes so that they could be compared to the impressions from the scene. An investigator from the Highway Patrol purchased a pair of Fila Grant Hill Olympic athletic shoes. Although the two pair of shoes were different styles, Andrews testified the Fila manufacturer told him "all of the Grant Hill II designs have the exact same out sole pattern." Andrews testified that an expert concerning footwear impressions, it is sometimes necessary to confer with manufacturers to obtain information about shoes and shoe soles because there are so many different styles and sizes of shoes available.

¶84. Andrews then testified in his expert opinion the type shoe purchased by the Highway Patrol investigator could not be excluded as having made the impressions at the scene of the crime. Andrews also testified that the type of shoe which would have originally been in the shoe box found at Connie Moore's house would have also made the same type of impression.

¶85. Miss. R. Evid. 703 states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

This Court has allowed evidence, as a basis of an expert's opinion, that would otherwise be inadmissible hearsay. *Mississippi Valley Gas Co. v. Estate of Walker*, 725 So.2d 139, 152 (Miss. 1998). *See*

*Hull v. State*, 687 So.2d 708, 716-17 (Miss. 1996) (holding statements that expert used to base opinion on admissible where not offered to prove the truth of the matter asserted); *Slay v. Illinois Cent. Gulf R.R.*, 511 So.2d 875, 879 (Miss. 1987) (holding trial court did not err by allowing expert to testify about statements made to him in forming his opinion where statements were not offered to prove the truth of matter asserted).

¶86.    In *Morley v. Jackson Redevelopment Authority*, 632 So.2d 1284, 1293 (Miss. 1994), this Court addressed the issue of "whether the information relied on by an expert is admissible just by virtue of his reliance on it" in reaching his expert opinion. In *Morley*, this Court held that the trial court erred by allowing into evidence hearsay statements used by an expert where the statements were used not to explain the expert's opinion, but to merely bolster his opinion. *Id.* at 1294. In making its decision, the Court relied heavily *United States v. Grey Bear*, 883 F.2d 1382, 1392-93 (8th Cir. 1989), which held that "while a witness may rely on information which is inadmissible in evidence, that does not give the witness the right to circumvent the rules of hearsay by giving statements which corroborate his view." *Morley*, 632 So.2d at 1294.

¶87.    However, this Court, in *Slay*, held that the trial court did not err by allowing an expert to testify about statements made by employees of the Illinois Central Gulf as part of the basis for his opinion. 511 So.2d at 879. The trial judge overruled an objection that the statements were inadmissible, finding the testimony admissible "not for the purpose of proving the truth of what was told him, but for the purpose of showing that it was told to him, which led him to take certain other actions," such as conducting his own tests. *Id.* This Court held:

> Simply put, hearsay is "an out-of-court statement, not made under oath and not subjected to cross-examination, which is introduced for the truth of the matter asserted." Ellis &

41

Williams, Miss. Evidence, § 8-1 (1983). Here, the trial judge properly ruled that Copeland's testimony, relating statements made by those present at McNamara's test, was introduced not to show the manner of McNamara's examination, but to explain the basis for his own test of the locomotive. Consequently, there was no error.

*Id.*

¶88.    In *Walker*, Valley Gas asserted that if the offered statements had been allowed into evidence, the statements were not hearsay because they were offered to further explain the basis of the expert's opinion and not to prove the truth of the matter asserted. 725 So. 2d at 153. The plaintiffs, however, contended that the statements, if allowed, would have enabled Valley Gas to present to the jury statements offered to prove the truth of the matter asserted. *Id.* This Court held:

> [T]he trial court did not err by refusing to allow [the expert] to testify about the statement made by the unidentified man about the children playing in the abandoned house before the fire because such testimony would not go to explain the basis of the expert's opinion but would be used to prove the truth of the matter asserted, i.e., that there were children playing in the abandoned house where the fire ignited. Therefore, the statements were inadmissible hearsay and properly excluded by the trial court.

*Walker*, 725 So. 2d at 152-53.

¶89.    In the case sub judice, Andrews, as an expert, was qualified to testify regarding his forensic testing performed on the Fila Olympic shoes. However, Andrews went a step further and testified, based on what was told to him by the Fila representative, that if he had performed an analysis on the Fila Grant Hill II MID shoes, those, too, would be consistent with the impressions. This statement does not show that Andrews was led to other actions because the Fila Grant Hill II MID shoes were never tested. This statement was only offered to prove the truth of the matter asserted–that the Fila Grant Hill II MID shoes were consistent with the impressions found at the crime scene. We, therefore, find that the testimony by Joe Andrews regarding the shoe impressions was based on hearsay and was erroneously admitted by the trial court.

42

## VIII.   WHETHER FLOWERS WAS DENIED HIS FUNDAMENTAL AND CONSTITUTIONAL RIGHT TO A FAIR SENTENCING HEARING BY THE SUBMISSION OF THE "GREAT RISK OF DEATH TO MANY PERSONS" AGGRAVATING CIRCUMSTANCE.

¶90.    Flowers next argues that by obtaining four separate indictments, the State was forced to rely on the other three victims to prove the aggravating factor of "knowingly created a great risk of death to many persons." Flowers claims that where the conduct alleged to constitute "a great risk of death to many persons" was the same conduct that was the subject of other indictments for which the death penalty is also sought, the use of this factor violated the Eighth Amendment, the double jeopardy clause of the Fifth Amendment and Mississippi law. The State argues that this particular claim has previously been addressed and rejected by this Court. The State also asserts that the lack of objections serves as a procedural bar to this issue. But, as stated above, we will address this issue under the plain error rule.

### A.      Whether the Submission of the "Great Risk of Death to Many Persons" Violated Flowers's Rights Secured by the Eighth Amendment to the United States Constitution.

¶91.    Flowers first contends that the use of this aggravator violated his rights under the Eighth Amendment. As the State points out, this issue was addressed in *Flowers I* where we held:

> Finally, we note that one of the aggravators that the jury found was that Flowers created a great risk of death to many people. This Court has allowed evidence of other crimes against other victims during sentencing where this aggravator has been sought by the State and the proof supported it. *See McGilberry v. State*, 741 So.2d 894, 925 (Miss. 1999) (robbery case where four murders were committed and where the aggravator of creating a great risk of death to many people was given and the proof supported). We note however, that the District Attorney in McGilberry tried all four murders together. The Court has also considered this same aggravator and rejected it because of the lack of proof to support the giving of such an aggravator, because the Court stated "there is no evidence that Porter knowingly created a great risk of death to anyone, other than Brown, his intended victim." *Porter v. State*, 732 So.2d 899, 905-06 (Miss. 1999) (citing *Jackson v. State*, 684 So.2d 1213, 1235 (Miss. 1996)). Thus, evidence regarding the other killings would have been relevant in the case at bar during sentencing, whereas during the guilt phase, although some of the evidence is probably admissible, the overwhelming

43

prejudicial evidence regarding the killing of the other three victims was for the most part irrelevant and inadmissible. The admission of this irrelevant, inadmissible testimony and exhibits was substantially prejudicial to Flowers. Therefore, we must reverse and remand for a new trial on guilt and if necessary, sentencing. On remand, if a sentencing hearing becomes necessary, and if the prosecution alleges as one of the aggravators that Flowers created a risk to many people, then evidence regarding the other three killings would be relevant at sentencing.

*Flowers I*, 773 So. 2d at 325.

¶92. Miss. Code Ann. § 99-19-101(5)(c) provides that a defendant must have "knowingly created a great risk of death to many persons." "In upholding the aggravator, we have said that to restrict its use to those crimes where a very large number of individuals were at risk or to where the safety of those, other than an intended few, is jeopardized would be to limit the statute beyond its intended scope." *Snow v. State*, 800 So.2d 472, 493 (Miss. 2001). *See Jackson v. State*, 672 So.2d 468, 490 (Miss. 1996) (finding the aggravator warranted where a defendant stabbed four children and one adult to death, and inflicted life-threatening stab wounds on two other children); *McGilberry v. State*, 741 So.2d 894 (Miss. 1999) (evidence in capital murder prosecution supported jury's finding of aggravating circumstance of creating a great risk of death to many persons, committing capital offense for pecuniary gain during the course of a robbery). The risk must be to someone other than the intended victim. *Porter v. State*, 732 So.2d 899 (Miss. 1999) (evidentiary basis insufficient where a defendant, hired to kill the victim, hid outside the doorway of the victim's home and shot him when he came to the door, fleeing afterwards despite the fact that there were other persons in the house).

¶93. Based on case law and statutes of this state, the submission of this aggravator did not violate Flowers's Eighth Amendment rights. Therefore, this Court finds this issue to be without merit.

B. **Whether The Submission of the "Great Risk of Death to Many Persons" Violated Flowers's Rights Secured by the Double**

**Jeopardy Clause of the Fifth Amendment to the United States Constitution.**

¶94. Flowers next argues the submission of this aggravator violated the double jeopardy clause of the Fifth Amendment. Flowers cites *Meeks v. State*, 604 So. 2d 748 (Miss. 1992) to support his argument that a defendant may not be punished twice based on the same set of facts. But as the State points out, a similar argument was addressed and rejected in *Wilcher v. State*, 697 So. 2d 1087 (Miss. 1997):

> Wilcher argues that, by having his conviction in the capital murder of Moore considered as an aggravating circumstance, the jury was improperly required to weigh the same facts twice against the mitigating evidence, in violation of the double jeopardy clause of the Fifth Amendment. Wilcher correctly states that a capital murder defendant cannot be convicted of both capital murder and the underlying felony; the reason being that the defendant cannot be twice prosecuted for the same actions. *See Meeks v. State*, 604 So.2d 748, 753 (Miss. 1992). By analogy, Wilcher argues that the "same elements" or "*Blockburger*" test precludes the introduction of his conviction of the capital murder conviction of the second victim as an aggravator at the sentencing hearing on the first murder victim. *See Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932).

> Wilcher's analogy does not hold true. In this case, the court is not faced with one action for which Wilcher could be prosecuted on either the underlying crime or the capital murder. Rather, there are actually two murder victims-- the product of two separate criminal actions by Wilcher. Even though the same facts surround the murder of each victim, there are undeniably two victims, and two counts of capital murder arising from Wilcher's actions. Therefore, the "same elements" test does not apply.

> Furthermore, as the Fifth Circuit has observed:

>> [C]onsideration of other crimes at sentencing does not implicate the Double Jeopardy Clause because the defendant is not actually being punished for the crimes so considered. Rather, the other crimes aggravate his guilt of, and justify heavier punishment for, the specific crime for which defendant has just been convicted. *See United States v. Bowdach*, 561 F.2d 1160, 1175 (5th Cir. 1977) (rejecting virtually identical double jeopardy argument).

> *Sekou v. Blackburn*, 796 F.2d 108, 112 (5th Cir. 1986). Wilcher's argument to the contrary is without merit.

45

*Wilcher*, 697 So. 2d at 1105.

¶95.    Based on this Court's holding in *Wilcher*, we find this sub-issue to be without merit.

        **C.    Whether, under the Prosecution's Own Theory, the Submission of the "Great Risk of Death to Many Persons" Violated Mississippi Law.**

¶96.    Flowers finally argues that the use of the aggravator violated Mississippi law. Flowers solely bases this argument on a statement made by the prosecutor in closing argument.  The Assistant District Attorney stated:

> The Defendant went down to that store for the purpose of seeing Bertha Tardy. Derrick Stewart had been there two days, and Robert Golden had been there, that was his first day. He had no idea those two individuals would be there.

Because of this statement, Flowers argues the State admitted Flowers had no idea two of the other victims would be in the store that day; therefore, he could not "knowingly create[] a great risk of death" to anyone other than Bertha Tardy, his intended victim.

¶97.    The State argues that the evidence clearly supports the submission of this aggravator. The same weapon was used to commit all four murders, and testimony linked Flowers to this weapon. Eyewitness testimony placed Flowers near the scene of the crime.  There was also evidence that Mrs. Tardy had docked Flowers's paycheck after an incident regarding some batteries.  The State argues, and we agree, that the jury could have inferred Flowers deliberately killed Mrs. Tardy and robbed the store.

¶98.    There was also evidence that three other people were killed during the robbery. Flowers was a former employee of Tardy Furniture, so he was aware Bertha Tardy, Carmen Rigby, and other employees would be present at the store. Because the murders took place while the store was open for business, it was also likely that customers could have been in the store.  All this evidence supports the jury's finding that this aggravated circumstance existed.

46

¶99. This aggravator was properly submitted to the jury and did not violate Mississippi law. This Court finds this issue to be without merit.

¶100. In conclusion, the use of the "great risk of death to many persons" as an aggravator in the sentencing phase of this trial did not violate Flowers's Eighth or Fifth Amendment rights, nor did it violate Mississippi law. This issue is without merit.

> **IX. WHETHER THE TRIAL COURT VIOLATED FLOWERS'S RIGHTS SECURED BY THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND MISSISSIPPI LAW BY THE SUBMISSION OF AN ANTI-SYMPATHY SENTENCING INSTRUCTION.**

Flowers argues that the trial court submitted an anti-sympathy instruction to the jury, and thus, committed reversible error. The State argues that Flowers did not object to this instruction, but as stated above, we will address this issue under the plain error rule. The State also argues it is well-settled law that, although the jury may not be instructed to totally disregard sympathy during deliberations, the jury may be instructed as they were here.

¶101. Sentencing Instruction Number 1 stated, in pertinent part:

> You should consider and weigh any aggravating and mitigating circumstances, as set forth later in this instruction, *but you are cautioned not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling.*

(emphasis added). Both Flowers and the State cite to ***King v. State***, 784 So. 2d 884 (Miss. 2001). In ***King***, this Court held:

> In ***Blue v. State***, 674 So.2d 1184, 1225 (Miss. 1996), we approved an instruction which read in pertinent part as follows: [Y]ou are cautioned not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling. "[B]ecause the instruction does not inform the jury that it must disregard in toto sympathy ... the instruction is a proper statement of the law." ***Id.***

*King*, 784 So. 2d at 889. This Court has also held that the use of the words "not to be influenced by sympathy" does not mean that the jury is instructed to disregard sympathy. *Holland v. State*, 705 So.2d 307, 351 (Miss. 1997). *See also **Ladner v. State***, 584 So.2d 743, 759 (Miss. 1991).

¶102. The instruction given in the case sub judice is the exact instruction upheld in *King* and *Blue*. This Court finds the instruction was properly given, and this issue is without merit.

**X.      WHETHER FLOWERS WAS DENIED HIS FUNDAMENTAL AND CONSTITUTIONAL RIGHT TO A FAIR TRIAL BY THE CUMULATIVE EFFECT OF THE MATTERS ADDRESSED ABOVE.**

¶103. In his final assignment of error, Flowers asks this Court to reverse his capital murder conviction and sentence of death based upon the cumulative impact of the errors at his trial. The State argues all errors have been refuted with substantial authority; therefore, "[w]here there is no reversible error in any part, .... there is no reversible error to the whole." *Doss v. State*, 709 So. 2d 369, 401 (Miss. 1996)(quoting *McFee v. State*, 511 So.2d 130, 136 (Miss. 1987)). The State also contends that if this Court were to find that errors exist, there are no errors substantial enough to warrant reversal. "A criminal defendant is not entitled to a perfect trial, only a fair trial." *McGilberry v. State*, 741 So. 2d at 924 (citing *Sand v. State*, 467 So.2d 907, 911 (Miss. 1985)).

¶104. This Court has reviewed this case with "heightened scrutiny" and has found that the previously cited errors alone are sufficient to warrant reversal. Thus, when considered together, these errors also have such a cumulative effect as to require reversal. The cumulative effect of all of these errors is clearly the most substantial reason for this Court's reversal of this case. This Court, therefore, finds merit to Flowers's argument on cumulative error.

¶105. The State had more than ample evidence with which to try its case against Flowers. It is the duty of the State to provide each defendant with a fair trial, not to engage in tactics which mirror "prosecution overkill." This Court, more than 100 years ago, laid out a simple roadmap for the prosecution of criminal cases:

> The fair way is the safe way, and the safe way is the best way in every criminal prosecution. The history of criminal jurisprudence and practice demonstrates, generally, that if everyone prosecuted for crime were fairly and fully conceded all to which he is entitled, and if all doubtful advantages to the state were declined, there would be secured as many convictions of the guilty, and such convictions would be succeeded by few or no reversals.

*Johnson v. State*, 476 So. 2d 1195, 1215 (Miss. 1985) (citing *Hill v. State*, 72 Miss. 527, 534, 17 So. 375, 377 (1895)).

¶106. Notwithstanding the State's position that the fact that this was a circumstantial evidence case required the presentation of extensive evidence to the jury not just on Derrick Stewart, but also on the other three victims as well, the prosecution went far beyond the realm of admissible evidence in this case in order to improperly enhance the likelihood of a conviction of Flowers for the capital murder of Stewart. Had the prosecution only heeded the 1895 admonition of this Court in *Hill*, and the long-standing decisions of this Court regarding admissibility of evidence, it would have greatly increased its chances of having not only a conviction and sentence, but also an "affirmed" conviction and sentence.

**CONCLUSION**

¶107. This Court and its members do not function in a vacuum. We acknowledge that we cannot begin to fully understand and appreciate the extreme grief experienced by family members and friends of not only Derrick Stewart, but also Bertha Tardy, Robert Golden and Carmen Rigby, because of these senseless murders. These survivors are also victims. Additionally, these victims must suffer the pain of knowing that

almost seven years after these murders, no one stands convicted and punished for these brutal killings. Were we to ignore the *Hill* admonition to be fair -- were we to ignore our well-established and long-standing case law concerning admissibility of evidence -- were we to ignore our decision in *Flowers I* -- were we to ignore our constitutional oaths -- we could simply turn our heads and affirm Flowers's conviction and sentence of death. However, this we cannot and will not do. We must do that which our allegiance to the law requires us to do. Accordingly, for the reasons stated above, this Court reverses the judgment of the Montgomery County Circuit Court and remands this case to that court for a new trial consistent with this opinion.

¶108. **REVERSED AND REMANDED.**

**PITTMAN, C.J., SMITH, P.J., WALLER, COBB, DIAZ AND GRAVES, JJ., CONCUR. McRAE, P.J., AND EASLEY, J., DISSENT WITHOUT SEPARATE WRITTEN OPINION.**